## CLARK vs. FARRINGTON.

### APPEAL FROM CIRCUIT COURT, DODGE COUNTY.

Heard February 23.]                    [Decided June 19, 1860.

### Corporation—Stock—Powers—Mortgages.

The La Crosse and Milwaukee R. R. Co. had authority, under its charter, to receive from a subscriber, as payment for stock in the company, a promissory note secured by mortgage on real estate, instead of cash, and the securities are valid, and will be enforced against the maker.

While corporations will be restrained strictly to such powers as are conferred upon them by their charters, and all their acts done outside of such powers are void; yet corporations may employ the usual and necessary means to accomplish the purposes for which they are created; and in judging of those means, they will not be restricted by narrow and illiberal rigor in their choice of those best adapted to the execution of their powers.

In exercising the powers conferred upon a corporation, it may adopt any proper and convenient means tending directly to their accomplishment, not amounting to the transaction of a separate unauthorized business.

The La Crosse and Milwaukee R. R. Co. were not required in all cases to receive payment for its stock in cash only, but the directors had the power to fix the manner of payment, limited only by the general purposes of the charter, which was to build and equip a railroad. The raising of money was not the object of the incorporation, but only the necessary means to accomplish that object.

The taking of a mortgage to secure the payment for stock in a railroad company is not an unwarranted dealing in real estate by the company.

Clark vs. Farrington.

A party who has made a note and mortgage to secure the payment for stock for which
    he has subscribed in a railroad company, is estopped to set up as a defense to
    the payment of such note and mortgage, that the transaction is a fraud upon the
    cash subscribers of the company.

This action was commenced by William D. Clark against William Farrington and wife, by the service of a summons and complaint. The complaint set forth on information and belief, that Farrington, for the purpose of securing the payment to the La Crosse and Milwaukee Railroad Company, the sum of eight hundred dollars, with interest thereon, on or about the 28th day of March, 1853, made, executed and delivered to the La Crosse and Milwaukee Railroad Company, an instrument in writing, of which the following is a copy, viz :

"Know all men by these presents, that William Farrington, of the town of Beaver Dam, and state of Wisconsin, being justly indebted to the La Crosse and Milwaukee Railroad Company in the sum of eight hundred dollars, lawful money of the United States of America, for full value received, does, in consideration thereof, hereby promise to pay to the said La Crosse and Milwaukee Railroad Company or order, the said sum of eight hundred dollars at the expiration of ten years from the first day of July in the year of our Lord, one thousand eight hundred and fifty-three, together with interest thereon at the rate of eight per centum per annum, payable annually on the first day of July in each year after the date hereof, principal and interest, at the office of said company, in the city of Milwaukee.

"In witness whereof, I have hereunto set my hand this twenty-eighth day of March, in the year one thousand eight hundred and fifty-three.

("Signed,)        WILLIAM FARRINGTON."

That as collateral security for the payment of the above indebtedness, the defendant, and his wife, on the same day, executed, duly acknowledged, and delivered to the La Crosse and Milwaukee Railroad Company, a mortgage, whereby they granted, bargained, and sold, to the La Crosse and Milwaukee Railroad Company, the premises, &c., containing in all, ninety-eight acres of land, more or less. By which mortgage it was expressly conditioned that if the defendants should pay the sum of eight hundred dollars, and interest, to the La Crosse and Milwaukee Railroad Company, or their

assigns, according to the tenor and effect of the promissory note at the time the same should become due, then the mortgage and the note should become null and void, and that in case of the non-payment of the sum and interest mentioned in the note, or any part thereof, at the time or times above limited for the payment thereof, then it should be lawful for the La Crosse and Milwaukee Railroad Company, or its assigns, to sell the mortgaged premises at public auction, and on such sale to make and execute to the purchaser or purchasers, good and sufficient deeds of conveyance, according to the statute, and out of the moneys arising from such sale, to retain the principal and interest which should then be due on the note, together with costs, charges, and all taxes paid by the company, and the overplus, if any, to be returned to the mortgagors.

And that the mortgage was duly acknowledged so as to entitle it to be recorded, and was afterwards recorded in the office of the Register of Deeds, of Dodge county, and that on or about the 1st of July,1854, the LaCrosse and Mil. R. R. Co., for a valuable consideration to it, paid by the plaintiff, sold and transferred said promissory note and mortgage, as collateral to the same, to the plaintiff, by delivering said promissory note and accompanying mortgage to the plaintiff, who is now the owner and holder thereof, by virtue of the transfer and delivery.

And that the defendant, William Farrington, has failed to comply with the condition of the promissory note and mortgage, by omitting to pay any interest on the principal sum of eight hundred dollars at the rate stipulated from the date thereof, to the 1st of July, 1859, which amounted to the sum of $405,33, on which judgment was claimed.

The defendants answered, admitting the making of the note and mortgage as set forth, and the delivery of the same to the La Crosse and Milwaukee Railroad Company, as in the complaint mentioned, but they have no knowledge or information thereof sufficient to form a belief that the LaCrosse and Milwaukee Railroad Company ever sold and transferred the note and mortgage to the plaintiff.

And for a further defense the defendants answered, that the note and mortgage were executed and delivered to the La Crosse and Milwaukee Railroad Company, on the express condition and for the consideration that the Railroad Company would issue and deliver to William Farrington, certifi-

cates of stock for eight shares of the capital stock of the company, such as are required to be issued to the stockholders of the company by section six of an act to incorporate the La Crosse and Milwaukee Railroad Company, in the same manner as if said stock had been subscribed for and paid by him in cash; and also on the consideration and agreement on the part of the Railroad Co., that they would save the defendant harmless of, and from any liability by the accruing of any interest on said promissory note, or by the maturity of the principal thereof. That the La Crosse and Milwaukee Railroad Company, did not, in pursuance of that agreement deliver the certificate of the stock to the defendant, and never have delivered the same to him, although said defendant has frequently demanded the same of the company. That sometime afterwards, and after the delivery of the note and mortgage, the company delivered to the defendant a pretended certificate of stock under the agreement, of which the following is a copy:

" This is to certify, that William Farrington, of Beaver Dam, Wisconsin, is entitled to eight shares of one hundred dollars each, in the capital stock of the La Cross and Milwaukee Railroad Company, which have been fully paid by a mortgage on real estate. This stock is subject to a reservation of eight per cent. per annum in favor of the company out of any earnings or dividends which may be declared in favor of the holder thereof, and also of the amount ‹of all taxes paid by the company upon said mortgaged lands, in consequence of the neglect of the mortgagor, or his assigns to pay such taxes, until the final payment of the principal sum of said mortgage. It is, therefore, not assignable, except it be subject to the above reservations. This stock draws to the holder thereof, ten per cent. per annum (less the amount of the above reservations), subject to the above reservations, until a dividend is declared from the earnings of the road.

" Milwaukee, March 28, 1853.

STODDARD JUDD, President."

" LEVI BURNELL, Secretary.

And the defendants say that they are advised that the railroad company had no power or authority by their charter to receive, or agree to receive, any other consideration for any capital stock issued by them in pursuance of their charter, except lawful money of the United States, and that

any agreement between the company, by which stock was to be issued on the receipt by them of mortgages on real estate, choses in action, or other real personal property, was wholly inoperative, illegal and void. That no dividends have been declared, and none received by the defendant.

These defendants further answered, that the promissory note was never endorsed by the La Crosse and Milwaukee Railroad Company to the plaintiff, and that he is not a *bona fide* holder of the note, but that the same was delivered to him with a full knowledge on his part of the want of consideration for said promissory note, or with sufficient notice to him of the defense of the defendant, William Farrington, to the note and of the equities existing between him and the railroad company in reference to the same.

Upon the trial of the cause the circuit judge found as follows :

### DECISION OF THE COURT.

This action having been brought to trial before the court, a jury having been waived, and having heard the proofs and allegations of the parties and duly considered the same and the pleadings in this action, the court adjudges and finds the facts in the case to be as follows, viz :

That the La Crosse and Milwaukee Railroad Company is a railroad incorporation duly created by an act of the legislature of the state of Wisconsin, passed 2d April, 1852, and the subsequent acts amendatory thereof.

That the defendant, William Farrington, on the day it bears date, made, executed and delivered to the said La Crosse and Milwaukee Railroad Company, a note or obligation, set forth in the complaint. That at the same time the defendants made, executed and delivered to the said railroad company the mortgage in the plaintiff's complaint set forth. That said note and mortgage were executed and delivered to said company on an agreement between said company and said William Farrington, that said company should, in exchange for the said note and mortgage, deliver to said William Farrington eight shares of the capital stock of said railroad company. That independent of this verbal agreement, the defendant, William Farrington, did not subscribe for any stock of said company, or sign any subscription book or paper for said stock. That at or about the time of the execution and delivery of said note and mortgage, the said railroad company de-

livered to the said William Farrington as and for the stock so agreed to be delivered as aforesaid, the paper set forth in the answer. That the above certificate of stock was all the consideration said Farrington ever received for said note and mortgage; that at or about the same time the said William Farrington and said railroad company executed and delivered to each other the agreement in writing under seal following, viz:

'WHEREAS, William Farrington has executed a note and mortgage in favor of the La Crosse and Milwaukee Railroad Company, bearing date on the 28th day in March, A. D. 1853, for the sum of eight hundred dollars, with interest annually, at the rate of eight per cent. per annum from and after the said 28th day of March, A. D. 1853; and WHEREAS, said note and mortgage have been received in payment of eight shares of the capital stock of said company;

Now, therefore, in consideration of the relinquishment and assignment by said William Farrington to the said company, of so much of the dividends on said stock which he may become entitled to, as shall be sufficient to pay the interest on said note, the said company agree not to demand said interest from him, and in case said note and mortgage shall be negotiated by said company, then said company agree to save him harmless from said interest.

And said William Farrington hereby assigns to the said company so much of any dividends to which he may become entitled on said shares, as shall be sufficient to pay said principal sum, when the same shall become due.

And it is further understood, that this agreement of the said company to relinquish said interest or to secure the said William Farrington harmless therefrom, shall not be a defense on his part against the payment of such interest if said note and mortgage shall be in the hands of a third party, as security or otherwise; nevertheless, the said railroad company agrees to pay said interest promptly.

In witness whereof, the board of directors of said company have caused these presents to be signed by their duly constituted agent, P. M. Johnson, and said William Farrington has also set his hand and seal this 28th day of March, 1853.

WILLIAM FARRINGTON, [L. S.]
P. M. JOHNSON, Agent.

That there has been no dividend from the earnings of said railroad company.

The court further finds, that on the 3d day of December, 1855, the said railroad company made, executed and delivered to the plaintiff in this action the following instrument, namely:

"UNITED STATES OF AMERICA, STATE OF WISCONSIN.

No. 808.                                              $800.

*La Crosse and Milwaukee Railroad Company:*

Know all men by these presents, that the La Crosse and Milwaukee Railroad Company is justly indebted, and promises to pay to James Luddington, Esq., or bearer, eight hundred dollars on the first day of July, 1865, at the Broadway Bank, in the city of New York, together with interest thereon from and after the first day of July, 1855, at the rate of eight per cent. per annum, payable on each first day of January and July, semi-annually thereafter, on the presentation and surrender of the annexed coupons at the said bank. To the payment whereof the said company hereby bind themselves firmly by these presents, and for the better security of such payments being made to the holder hereof, the said company have assigned and transferred, and by these presents, do assign and transfer to the said holder of this bond a certain note for the sum of eight hundred dollars, executed by William Farrington, together with a mortgage given collateral to, and for the purpose of securing the payment of the same, dated on the 28th of March, 1853, payable in ten years from the first day of July, 1853, with interest at the rate of eight per cent. per annum, which said note and mortgage are hereto appended and are transferrable in connection with this bond to any parties or purchasers whomsoever, and not otherwise. And the said company do hereby authorize and empower the holder of this bond, at any time, in case said company shall fail to perform any of the foregoing stipulations by neglecting to pay either principal or interest on this bond when the same shall become due, to proceed and foreclose the said mortgage, or take such other legal remedy on said note and mortgage against said mortgagor, or against this company, on this present bond, or on both, as shall seem proper and expedient *to* said holder hereof. The holder hereof may surrender the same with the securities and unmatured coupons attached, to the secretary of this company at any time within five years from the date hereof, and receive in full payment of the prin-

.  cipal of the same, eight shares of the capital stock of said company, fully paid.

In testimony whereof, the said company have hereto caused to be affixed, their corporate seal, and these presents to be subscribed by their president and countersigned by their secretary.

By order of the board of directors, this December 3d, 1855.

STODDARD JUDD, President.

LEVI BURNELL, Secretary.

(Coupons in usual form annexed.)

That to said instrument were attached the said note and mortgage, and which were, at the same time, delivered to the plaintiff. That the said last mentioned instrument was the only written transfer of said note and mortgage to the said plaintiff, and that the said note so delivered was not endorsed by said company.

The court further finds, that the defendant, William Farrington, has offered to surrender said certificate of stock, or to have the same cancelled, and again offers the same in court for that purpose.

That from the foregoing facts so found, the court draws the following conclusions of law:

1.  That the note is not of such a character, and the plaintiff not such a holder thereof, as to prevent the defendant, William Farrington, setting up in this action any defense which he might have to the same in the hands of the payees, as to said note.

2.  That the agreement between the La Crosse and Milwaukee Railroad Company and the defendant, William Farrington, by which they were to deliver him eight shares of the capital stock of said company, for the note and mortgage as before mentioned, was wholly illegal, inoperative, and void. That said railroad incorporation had no power to receive said note and mortgage for their stock, in lieu of cash. That the certificate of stock received by the defendant, had no legal value, and that said defendant received no consideration for said note and mortgage.

3.  That said defendant is not estopped by any thing contained in the agreement between him and said railroad company before mentioned, from setting up this defense as against the plaintiff in this action.

It is, therefore, ordered that judgment be entered for the

defendants in this action in due form, with their costs and disbursements as the same may be taxed. By the court,

J. E. MANN, Judge.

Dated, 9th December, 1859,

To this decision of the circuit judge the plaintiff's counsel filed the following exceptions:

1. To the conclusion of law of said circuit judge, that the promissory note set forth in the complaint, is not of such a character, and the plaintiff not such a holder thereof as to prevent the defendant, William Farrington, setting up in this action any defense which he might have to the same in the hands of the payees thereof, or from setting up any equities existing between him and said payees as to said note.

2. To his conclusion of law that the agreement between the La Crosse and Milwaukee Railroad Company and the defendant, William Farrington, by which said company were to deliver him eight shares of the capital stock of said company for the note and mortgage mentioned in the pleadings, was wholly illegal, inoperative, and void.

3. To his conclusion of law that said railroad incorporation had no power to receive said note and mortgage for their stock in lieu of cash.

4. To his conclusion of law that the certificate of stock received by the defendant, William Farrington, had no legal value, and that the said defendant received no consideration for said note and mortgage.

5. To his conclusion of law that said defendant, William Farrington, is not estopped by any thing contained in the agreement between him and said railroad company from setting up this defense as against the plaintiff in this action.

Upon this decision a judgment of dismissal was entered. from which the plaintiff took this appeal.

*H. S. Lee,* for the appellant, upon the point that this note does not obtain its negotiability from the law merchant, but from the peculiar character and design of the instrument itself, and that all equities were relinquished. Cited the following authorities: *Morris Canal & Banking Co. vs. Fisher,* 1 Stockton Ch., 667; 3 Am., Law Reg., 423; *Carr vs. Le Fevre,* 27 Penn. St. R., 413; 3 Kernan, 625; 4 Duer, 582; 22 Wend., 364; 1 Austr. R.. 229; Pierce on Am. R. R. Law, 371, 372, and cases cited; 3 Am. Law Reg., 433. Upon the point

that the note and mortgage were negotiable in the same manner, he cited 4 Chand., 153; 3 id., 83; 14 Penn. St. R., 17. Upon the point that the transfer made in this case amounted to an indorsement, he cited, *Partridge vs. Davis*, 20 Vt., 502; 2 Mass., 295; 12 id., 14. That it might be on this or any other paper, &c., *Folger vs. Chase*, 18 Pick., 63; *Merchants' Bank vs. Spicer*, 6 Wend., 443; *Brown vs. Butch. and Drov. Bank*, 6 Hill, 443; 20 Vermont, 503; Chitty on Bills, 227. If the defendant had been defrauded by the railroad company, he had, by his own laches, lost his right to assert the fraud. 1 Sand. Ch. 411; 16 Mass., 94; 8 Pick., 90; Redfield, 63; 6 Ohio St., 120; 13 Grattan, 40; Pierce on R. R. Law, 509; 10 John, 484; 22 Wend, 348; *Bushnell vs. Beloit*, 10 Wis., 195; 5 Gilm., 59.

Upon the point that the company might bind itself by a negotiable promissory note, he cited *Came vs. Brigham*, 39 Maine, 35; *Moss vs. Oakley*, 2 Hill, 265; *Kelley vs. Mayor of Brooklyn*, 4 id., 263; Angell & Ames on Corp., chap. 8, § 257; 1 Cow., 532, 536, 542; 2 Hill, 265; 1 Cow., 513; 9 Paige, 476; A. & A. on Corp., 276, 286, 289; 4 Hill, 263, 442; 3 Wend., 94; 5 Hill, 137; 5 Wend., 590; and that it might take one, and having taken it, it would be presumed to have been done in the legitimate scope of its business. *Mitchell vs. Rome R. R. Co.*, 17 Geo., 574; 6 Ohio St. R., 132; Pierce on R. R. Law, 83, (note,) 373, (note;) A. &. A. on Corp., 141; 1 Green Ch., 117; 1 Sand Ch., 411; 19 N. Y., 370; 6 Cal., 1; 5 Gilman, 48; 10 Cal., 441; 10 Wend., 344; 6 Hill, 33; 4 Denio, 392; 2 Cow., 664; 3 Sand. Ch., 339; 1 Sand. Ch., 179; Pierce on Am. R. R. Law, 512, *et seq.; Barry vs. Merchant's Ex. Co.*, 1 Sand. Ch., 280; 3 Comst., 473; 4 Edw. Ch., 575; 2 Cow., 699; 6 Yerger, 499; 2 Hill, 439; 1 Sand. Ch., 53; 1 Watts, 385; 9 Humph., 269; 11 Vt., 402; 5 Hill, 137; 15 Johns., 44; 4 Comst., 464; 1 Cow., 514; 5 How. (U. S.) 83; 1 Randolph, 73; 3 id., 142; 3 Sand. Ch., 339; 2 id., 39; 3 id., 161; 13 Penn., 13; 6 Humph., 519; 9 Paige, 470; 7 Ohio, 354; 13 Barb., 324; 6 Pick., 427; 5 Gill & John., 424; 5 Barr, 345; 12 Barb., 28; 11 Serg. & R., 411; 1 R. I., 312; 7 Serg. & R. 343; 12 Geo., 13; 5 Wis., 173; A. & A. on Corp., 141, 146, 183, 253, 292; 4 Wheat., 413; 7 id., 553; 32 N. H., 504; 8 Cush., 319; 5 Mass., 80; 6 Ind., 317; 5 Wend., 590; 5 Gilman 48.

That the charter of the company vested this discretion in the directors, and they had authority to exercise it at discretion.

Laws 1852, chap. 325, § 4, 5, 9 ; *Rex vs. The Mayor and Aldermen of London,* 3 Ang. & A., 271 ; 4 Paige Ch. R., 230 ; *Rex vs. Justice of Norfolk,* 1 N. & M., 67 ; 1 Edw. Ch. R., 371 ; 24 Vt., 475 ; 5 Wend., 489 ; 1 Johns. Ch., 18 ; 21 Wend., 218. Upon the point that this defense was unconscionable in enabling a party to take advantage of its own wrong, and would be discountenanced by the courts, he cited : *Juday vs. American Life Ins. Co.,* 4 Ind., 333 ; *Henry vs. Vermillion & Ash. R. R. Co.,* 17 Ohio, 187 ; *Mitchell vs. R. R. Co.,* 17 Geo., 588 ; *Troy & Rutland R. R. Co. vs. Kerr,* 17 Barb., 601; *Ogdensberg R. & C. R. R. Co. vs. Frost,* 21 id., 541; *Westchester R. R. Co. vs. Hickman,* Penn. Sup. Ct.; Pierce on Am. R. R. Law, 64, 65 ; 21 Barb., 541; Ang. & A., 590, *et seq.;* 32 Miss., 460; 25 Penn. St., 156, 160; 12 La R. An., 38 ; 16 N. Y. Rep., 451; *Wright vs. Shelly R. R. Co.,* 16 B. Mon., 5. And it is no defense that it was given in lieu of cash. *Vt. Cent. R. R. Co. vs. Clayes,* 21 Vt., 30 ; *Greenville & Col. R. R. Co. vs. Woodsides,* 5 Rich., 224 ; *McRae vs. Russell,* 12 Iredell, 224 ; Pierce on Am. R. R. Law, 65, 66 ; Redfield on R. R., 87, 88 ; 1 Sand. Ch. R., 411; 12 Iredell, 224 ; 28 Barb., 260 ; 28 Penn. St., 325 ; A. & A. on Corp., 593 ; 8 S. & R., 219 ; 3 Whart., 228 ; 10 Wend., 341: 14 John., 238 ; 6 Ind., 318 ; 13 La. R., 545 ; 5 Rich., 145 ; 17 Geo., 587; 1 Casey, 156 ; 3 Sand. Ch., 466 ; 13 S. & R., 256 ; 3 Ala., 660 ; 9 John., 217 ; 9 Paige, 152 ; 1 Sand., 94 ; 16 N. Y., 451; 9 Mass., 403 ; *Klein vs. Alton & Sangamon R. R.,* 13 Ill., 514 ; *Selma & Tenn. R. R. Co. vs. Tipton,* 5 Ala., 807 ; *Central Bridge Corp. vs. Bailey,* 8 Cush., 319, 323.

The respondents are estopped from denying the power of the railroad company to take the note and mortgage, having been a party to the contract, and having received its benefits. 8 Wend., 483 ; 3 Sand. Ch. R., 341–344 ; 2 Ala., 451; 5 id., 256 ; 8 id., 828 ; 1 Rich., 283 ; 5 B. Mon., 130 ; 2 Kelly, 92 ; 3 Rand., 136 ; 2 Litt., 300 ; 4 Comst., 464 ; 14 Penn., 83 ; 31 Penn. S., 489 ; 7 Ohio, 357 ; 8 Sm. & M., 173 ; 6 Hill, 37 ; 16 Mass., 94 ; 7 Met., 275 ; 8 Wheat., 388 ; 3 Rand., 136 ; Ang. & A. on Corp., 281.

Upon the point that the company had paid no legal value, he relied upon the charter of the company, secs. 6, 19, 21 and 22, Laws of 1854, p. 147 ; 1858, p. 46. A subscriber may pay in any manner he may agree upon. *Kennebeck & Port. R. R. Co. vs. Palmer,* 34 Maine, 366 ; *Chaffin vs. Cummings,* 37 id., 76 ; *Danbury & Norwalk R. R. Co. vs. Wilson,* 22 Conn.,

453; *N. H. Cent. R. R. vs. Johnson,* 10 Foster, 390; *Chester Glass Co. vs. Dewey,* 16 Mass., 94; *Spear vs. Crawford,* 14 Wend., 20; 18 Ill., 190; 20 id., 657; 15 B. Mon., 234; 16 id., 5; 3 Sand. Ch., 466, 487, 493; 12 La. R., 638; 16 N. Y., 457; 16 Mass., 94; 5 Hill, 478; 14 John., 228; 12 Conn., 7; 499; 20 id., 178; Pierce, 104, 105, 106.

And his right to stock is a valid consideration for his promise to pay for the same. *Kennebeck & Port. R. R Co. vs. Palmer,* 34 Maine, 360 ; *Thompson vs. Page,* 1 Met., 565; *Ives vs. Sterling,* 6 id., 310; *Worcester Turnpike Co. vs. Willard,* 5 Mass., 86; *Fort E. Fort M. Plankroad Co. vs. Payne,* 17 Barb., 567; 34 Maine, 360; 21 Vt., 30; 22 Conn., 435; 5 Ala., 787; 7 Ind., 599; 2 Haw. R., 504; A. & A. on Corp., 582; 12 Conn., 507; 16 id., 593; 1 Caines R., 389; 2 Comst., 330. And a promise to take shares made after the company is organized and accepted, is binding on the subscriber. *Gleaves vs. Brick Church Turnpike Co.,* 1 Sneed, 491; *Hartford & N. Haven R. R. Co. vs. Kennedy,* 12 Conn., 499; *Danbury & Norwalk R. R. Co. vs. Wilson,* 22 id., 453; *Covington Plankroad Co. vs. Moore,* 3 Ind., 510; *Hamilton & Dansville Plankroad Co. vs. Rice,* 7 Barb., 157. And he is estopped to deny the validity of his subscription. 10 Watts, 364; 25 Penn. State, 156; 5 Rich., 145; 1 Sand., 49 ; 6 Rich., 91; 17 Barb., 578, and cases cited ; 7 id., 157; Pierce on R. R. Law, 56, *et seq.*

*Coon, Hollister, & Cotton, and Geo. B. Smith,* for the respondents, upon the point that the note was not indorsed, but passed only as a chose in action, liable to all equities of the maker, cited Story on Prom. Notes, § 120; Baily on Bills, ch. sec. 1, 120, 121, 5 ed.; Chitty on Bills, ch. 6, 251 (8th ed., 1833, see p. 265); *Gibson vs. Mint,* 1 H. Black., 605; Story on Bills, § 201; *Clark vs. Sigourney,* 17 Conn., 511. The form of the note was enough to put the plaintiff on inquiry. 3 Kent. Com., 9 ed., 101, 102, 103, 104, page 80 Mag., and cases there cited ; *Pringle vs. Phillips,* 5 Sand., 157, and cases there cited ; *Hall vs. Hale,* 8 Conn. R., 336; *Cone vs. Baldwin,* 12 Pick., 452; *Ayer vs. Hutchins,* 4 Mass., 273; *Holmes vs. Shaupas,* 5 Binn., 469; *Sandford vs. Morton,* 14, Ver., 228; *Tappan vs. Ely,* 15 Wend., 363.

The act incorporating this company is a public act. Sedgwick on Statute and Constitutional Law; *East Anglian R. R. Co. vs. Eastern Counties,* 7 Eng. L. and Eq. R., 505, and the knowledge of the plaintiff that the company had no

power to make this contract is to be presumed. The defendant was not a member of the company, because he did not subscribe in the manner prescribed by the charter. Pierce on American R. R. Law, 58; *Charlotte and South Carolina R. R. Co. vs. Blakely,* 3 Strob., 245; *Troy and Boston Railroad Co. Tibbitts,* 18 Barbour, 297.

The agreement with the railroad company was illegal and void; the company could not make the agreement to sell the stock, or take the note and mortgage for their stock. See the charter § § 2, 5, 6; *Jenkins vs. Union Turnpike Co.,* 1 Caines Ca., 86; *Croker vs. Crane,* 21 Wend, 211; *Hibernian Turnpike Co. vs. Henderson,* 8 Serg. & R., 217; *Ogle vs. The Sommerset & Mt. Pleasant Turnpike Co.,* 13 Serg. & R., 156; *Leighty vs. The President, Managers, & Company of the Susquehanna and Waterford Turnpike Co.,* 14 Serg. & R., 434; *Maybin et al. vs. Coulon,* 4 Dall., 295. Upon the point that a corporation could only make such contracts as are expressly authorized by its charter, or necessary to carry the purposes of the charter into effect, they cited: 3 Kent. Com., 9th ed., 298, 364; 1 Story on Contracts, sec. 317, 4th ed.; Parsons on Contracts, 120, 3d ed.; Angell and Ames on Corp., 5th ed., sec. 256, 375; *Jenkins vs. Union Turnpike Co.,* 1 Caines, 85; *Bard vs. Chamberlain,* 3 Sand. Ch. 31; *The People vs. Utica Ins. Co.,* 15 J. R., 357; *North River Ins. Co. vs. Lawrence,* 3 Wend., 483; *Beach vs. Fulton,* 3 Wend., 583; *The Life and Fire Ins. Co. vs. The Mechanic's Ins. Co. of N. Y.,* 7 Wend., 3; *Hodges vs. The City of Buffalo,* 2 Denio, 110; *McCullough vs. Moss,* 5 Den., 567; *The Auburn and Cato Plank Road Co. vs. Douglas,* 5 Selden, 444; *Thompson vs. Schermerhorn,* 2 Selden, 92; *Halstead vs. Mayor of New York,* 3 Coms., 430; *Sutton vs. Cole,* 3 Pick., 232; *Salem Mill Dam Co. vs. Ropes,* 6 Pick., 32; *Stetson vs. Kempton,* 13 Mass., 272, 278; *New York Fire Ins. Co. vs. Ely,* 5 Conn., 558; *Hood vs. The New York & New Haven R. R. Co.,* 22 Conn., 502; *Commonwealth vs. Erie and Northeast R. R. Co.,* 27 Penn., 351; *Leggett vs. The New Jersey Manf. and Banking Co.,* 2 Saxton, 541; *Fisher vs. Coyle,* 3 Watts, 407; *The Penn. & Delaware & Md. Steam Nav. Com. vs. Dandridge,* 8 Gill. and John., 248; *The City Council of Montgomery vs. Montgomery & Wetumpka Plank R. Co.,* 31 Ala., 76; *State of Ohio vs. Washington Library,* 11 Ohio, 96; 1 McLane, 43; *Dartmouth College vs. Woodward,* 4 Wheat., 636; *Bank of United States vs. Dandridge,* 12

Wheat, 64; *Head and Armory vs. Providence Ins. Co.*, 2 Cranch, 127; *Bank of Augusta vs. Earl*, 13 Peter, 518; *Perine vs. Chesapeake & Del. Can. Co.*, 9 How., 177; *Beaty vs. Knowler*, 4 Peters, 164; *Charles River Bridge vs. Warren Bridge*, 11 Peters, 496; *The Madison, Watertown, & & Mil. Pl'k. R. Co. vs. The Watertown & Madison Pl'k R. Co.*, 7 Wis., 59; *The Governor & Company of Copper Miners vs. Fox et al.* 3 Eng. L. and Eq. R., 420; *East Anglian R. R. Co. vs. Eastern Counties R. R. Co.*, 7 id., 505; *Burmester, Public Officer, vs. Morris.* 8 id., 487; *Great Western R. R. Co. vs. Eastern Counties R R. Co.*, 12 id., 224; 13 Eng. L. and Eq. R., 506; *McGregor vs. Official Manager of Deat & Dover R. R.* 16 id., 180; *Johnston vs. Shrewsbury & B. R. R. Co.*, 19 id., 585; *Mayor of Norwich vs. Norfolk R. R. Co.*, 30 id., 120 and 143; *Solomans vs. Laing*, 12 Bevan, 352. The corporation can assert no capacity than such as is expressly given it by the charter. Pierce on American R. R. Law, 9; 2 Kent Commentaries, 298; *Watertown Plank R. Co. Madison Plank R. Co.*, 7 Wis., 59. The company has no power to traffic in real estate, or to hold real estate except for the necessary use of the company. Pierce American R. R. Law, 13; *Overmeyer vs. Williams*, 15 Ohio, 26; *State vs. Newark*, 1 Dutcher, 315; *Norfolk R. R. Co. vs. Mayor of Norwich*, 30 Eng. Com. L. and Eq., 120.

*By the Court,* PAINE, J.   The cash capital in this state was inadequate to the building of its railroads, or even to the payment of such proportion as is usually paid in cash for stock in the older and more wealthy communities. But the farmers along the routes, having confidence in the success of the enterprises, and the ultimate benefit to themselves, were willing to mortgage their farms for stock, placing the securities in the hands of the companies, to negotiate and raise the funds necessary for building the roads. This practice was extensively adopted along most of the roads in the state. The securities were taken and negotiated by the companies, and default having been made in payment, a number of actions have been brought to collect the notes, or foreclose the mort-

gages. The defense is now set up, that the companies had no power under their charters to take these securities for stock, and that they were therefore void.

As is usual in such cases, many considerations were alluded to in the arguments of counsel, which have no bearing upon the legal question presented. If the farm mortgagors influenced, perhaps, by public spirit, combined with the hopes of private gain, have mortgaged their farms for stock, the fact that those hopes have failed, and that financial ruin has fallen upon the enterprises, and that the execution of their contracts may prove hard and calamitous to many of them, furnish no reason in law why they should not be executed, provided they were such contracts as might in law be made. On the other hand, if the companies had no power to take these notes and mortgages for any purpose, so that they were utterly void in their hands, the fact that large amounts have been invested in them, which will be lost to the purchasers, is no reason why the court should hesitate to declare them void.

It has been contended on the part of the plaintiff that even if the companies had not the power to take these notes and mortgages for the particular purpose for which they were in fact taken, yet they had power to take notes and mortgages for some purposes, and that being so, that these would be enforced in the hands of *bona fide* purchasers for value, which they claim to be. Perhaps some of the cases might be decided upon that ground. But as several have been argued, in some of which it will be necessary to decide upon the question of power, and as the conclusion at which we have arrived upon that, will render a decision of the others unnecessary, we will proceed to address ourselves to that, without further notice of other considerations.

The question is, had the companies the power to take these notes and mortgages for stocks? In this case it arises under the charter authorizing the construction of a railroad from

Milwaukee to La Crosse. The counsel for the defendants contend that the company had not the power, and that the transaction was a violation of its charter. To lay a foundation on which to sustain this position, they cited a large number of authorities establishing the proposition that a corporation has no powers except such as are conferred by its charter; and that its acts outside of those are void. This is too well settled to admit of dispute, and a moment's consideration of the great increase of corporations in modern times, and of the vast powers entrusted to them, as well as of the natural tendency of their accumulated capital to accumulate also influence and power, is sufficient to satisfy every intelligent mind of the absolute necessity of adhering to the rule of confining these bodies strictly to the accomplishment of those ends and objects which their charters authorize, and prohibiting them from all others. But while this is conceded, it is also true that to these organizations is entrusted the accomplishment of "enterprises of great pith and moment," which, when properly executed, contribute greatly to the convenience and prosperity of mankind, and even to the advancement of civilization—enterprizes impossible to private unassociated capital, and which sometimes task even the enormous energies of corporations beyond their strength, so that after expending the best efforts of human ingenuity to accomplish the end, they either fail entirely, or succeed perhaps in completing an improvement of which, others may reap the benefit, only by the pecuniary ruin of its originators.

These considerations are sufficient to show that the rule that corporations can exercise no powers not delegated, should not, from an undiscriminating timidity or apprehension, be extended so as to unwisely and unnecessarily cripple and restrict them, as to the means of executing the powers that are delegated. Powerful as they are, it must be assumed that the law is powerful enough not only to control and confine them

Clark vs. Farrington.

within their proper limits, but also within those limits, to allow them the exercise of a reasonable discretion in selecting among the various means that may be adapted to the execution of their powers.   It is accordingly held in a large class of cases, many of which are cited by the counsel for the plaintiff, and which we do not deem it necessary to refer to in detail, that a corporation may adopt any of the usual means employed to accomplish the purposes authorized by its charter.   It is true, that this right of selecting among the means adapted to the end, is generally stated as limited to those usual and necessary.   But precisely what limits those terms imply does not seem to be well defined.

The constitution of the United States gave Congress the power to pass all laws "necessary and proper" for carrying into execution the powers conferred upon the federal government.   That government chartered a bank, and its constitutionality being called into question, the supreme court of the United States placed a construction upon these words.   They held that the word " necessary" did not imply that the means used must be absolutely indispensable, but that the government might select any which were "needful," "requisite," "essential," or "conducive to" the end, and tended directly to its accomplishment, and therefore might charter a bank. Whether or not it justifies that conclusion, there is undoubtedly great force in the reasoning of Chief Justice Marshall, as to the necessity of the power on the part of the government to select convenient means for the execution of its powers.   And bearing in mind the disproportion between the powers of a government and those of an ordinary corporation, we think that reasoning goes to sustain the right of the latter to an equal freedom in selecting among various means proper for the execution of its powers.   There is a close relation between the principles applicable to the government of the United States and those applicable to a corporation.   The

former like the latter can exercise no powers except such as are delegated to it either expressly or implied as necessarily incident to those expressly delegated. The reasons for confining both within the limits of the delegated powers, are equally obvious and familiar, yet this being constantly conceded, it by no means follows, that either, within those limits, should be restricted with narrow and illiberal rigor, in the choice of means, adapted to the execution of their respective powers. And the same reasoning which excludes such rigor in the case of the government, in our opinion, justifies its exclusion in the case of a corporation. But in applying it to the latter, due allowance should be made for the difference in the magnitude of their powers, for it would not at all follow that a corporation might adopt any means which the government might.

But it is unnecessary to pursue this point further, as it has been expressly passed upon by this court. In the case of *Madison, &c., Plankroad Co. vs. Watertown, &c., Plankroad Co.*, 5 Wis., 173, it was held that a corporation is not restricted to the means either " usual " or " necessary," but might select those " convenient and adapted to the end," though " unusual" and not absolutely " necessary." It was a plankroad company, and its charter gave it no power to loan money; but the court say that if it had seen fit to make a loan to one of its contractors, to enable him to complete his contract, though unusual, it would have been a legitimate means of executing their power to build the road. When the case was here subsequently, and it appeared that the company had undertaken to assist in the building of another road, then its acts were held void, but this detracts nothing from the first decision.

This doctrine must, of course, be properly understood. It does not mean that a corporation may engage in a separate, distinct business, not authorized by its charter, as a means of

raising funds to accomplish the things authorized. This it could not do. A railroad company could not engage in banking, nor in manufacturing, nor speculating in real estate, as a means of raising money to build a railroad. It is only that it may adopt any convenient means proper in themselves, tending directly to the execution of the powers conferred, and not amounting to the transaction of any distinct, unauthorized business; though such means may not have been usually adopted in the execution of like powers.

We have, then, two established propositions of law:

1. A corporation can exercise no powers except those conferred by its charter.

2. In executing those powers it may adopt any proper and convenient means tending directly to their accomplishment, and not amounting to the transaction of a separate unauthorized business.

In order to decide this case, two questions remain to be determined. Was the taking of the note and mortgage for stock, an attempt by the company to execute powers not delegated? Or was it a mere means of executing those that were conferred? If it was the latter, then was it a means which the company was prohibited from using.

Upon the first question there seems to be no room for doubt. The company did not attempt to do any thing, except to execute its power of building a railroad. The defendant was willing to take stock, but had not the money to pay for it. He was willing to give his note for it, and secure it by a mortgage. The company took it in payment with the sole intention of transferring it to raise the money. The result is the same as it would have been if the defendant had mortgaged his farm to a third party, and obtained the money himself, and paid it for his stock. In the end, by either method, the company has the money, the defendant the stock, and the third party the note and mortgage. The com-

Clark vs. Farrington.

pany has simply resorted to a double transaction to get the money for its stock, instead of a single one. But it was a means tending directly to the execution of its power of build a railroad, by disposing of its stock for the money necessary therefor.

The other question is, whether this means was prohibited to the company? And towards this point the strongest arguments for the mortgagors is directed. It is said that the charter provides a specific method of raising funds for building the road; that is, by opening books for subscription for stock, and then requiring payment from the subscribers; and that this method having been provided for, every other is necessarily excluded. As a part of the argument, it is assumed that the charter contemplates and requires a payment in cash, and therefore, that the company is in effect forbidden to receive any thing else as such. This assumption is, of course, necessary, for the validity of the whole argument depends upon it. Let us examine whether it is correct. There is no express provision in the charter that the stock must be paid for in cash. Is such a provision implied? It was suggested that the language fixing the amount of each share at one hundred dollars, necessary implies that the payment must be in cash. It was said that "dollars" meant money, and was not descriptive of any thing else. But these suggestions seem entitled to but little weight when it is remembered that money is the standard of value, and is used as the representative and measure of the value of all other articles. Thus a note to be paid in specific articles, is drawn for the payment of so many dollars in the articles agreed on. The use of the denomination of money to fix the amount in value, is necessary in all such instruments. And the mere circumstance that the legislature used that language in fixing the amount of each share of the capital stock, cannot be considered as indicating any intention that the shares must necessarily be paid for in

cash. Because such a literal construction would require the company to keep its capital stock, consisting of money. For that capital stock is to continue after the road is built, and would still consist of shares of one hundred dollars each. And if the use of the word " dollars" necessarily requires each share to be paid for in cash in the first instance, it would equally require it to continue in money.

But the charter, instead of attempting to prescribe the manner of payment, expressly leaves it under the control of the directors. It provides that they may re-open the books for subscriptions, or open new ones ; may decide the amount to be paid on subscription, and " the time, manner, and proportions" in which the subsequent installments shall be paid. This power of the directors to prescribe the "manner" of payment, is directly repugnant to the theory under consideration. For if the charter had positively provided that payment should be made in cash, and not otherwise, than it was idle to say that the directors might prescribe the manner, for it was already fixed beyond their control. The power to prescribe the manner of payment, includes that of directing in what it should consist, which would, of course, be limited by the general purposes of the charter.

It also give them the power to make " such covenants, contracts, and agreements with any person or persons, co-partnership, or corporation whatsoever, as the execution and management of the works, and the convenience and interests of the company may require." This is certainly comprehensive language, and includes the power to make the contract in question, unless it is limited by other specific provisions relating directly to that subject matter. And we find none having that effect.

But it is said that the charter provides for stock subscription books, and that the defendant never subscribed in a book, and therefore he is not a stockholder. But is that ab-

solutely essential? True the charter provides for opening books and for subscriptions therein, and the same clause implies that a part should be paid, at the time of subscribing, and the remainder in installments as the directors should require. But suppose a party should be ready to pay for his stock at once? If he pays the money, and the company issues to him the stock, is he not a stockholder? Is it not a valid transaction? Or must he necessarily enter into a contract to pay, although ready to pay at once? Would not the company be authorized to receive payment and deliver the stock, under its general power to make whatever contracts the convenience or interests of the company might require, even though the formality of a stock subscription was not complied with? We cannot doubt it, and if such a transaction would be valid with one paying cash, it would be equally valid with one paying by note or mortgage, provided the company had power to take them in payment. So that it is left as before, depending simply on the question of power.

It is not true, as seems to be assumed, that the great primary object of the charter is to raise an amount of money equal to the capital stock. The primary object is to build and equip a railroad. Money is necessary as a means, but it is not the end. And we can see no objection whatever to a railroad company issuing stock and taking in payment materials or labor, or land necessary for its road. So far as it can build and quip its road for stock, it is the most simple and direct method of accomplishing it. It gets at the object, then, by a single transaction, when it would require two, if the subscriber must first pay the money, and then receive it back again for whatever he furnished. And we think it might be safely asserted, that no railroad was ever built in the country without disposing of more or less stock in payment for labor, materials, or land. And there are but very few cases where the propriety of this course, or the power of

the companies so to dispose of it, was ever called in question, and in those the power was sustained; while there are many cases where such contracts have been enforced, without question, disputes having arisen upon other points. The following may be referred to as illustrations: *Vermont Central R. R. Co. vs. George Clayes*, 21 Vermont, 30; *Boody vs. R. R. Co.*, 24 ib., 660. These are cases where a large proportion of the payments to contractors were to be made in stock. *Moore vs. Hudson R. R. Co.*, 12 Barb., 156; *Porter vs. Buckfield Branch R. R.*, 32 Maine, 539; *Barker et al. vs. T. & R. R. R. Co.*, 27 Verm., 767, and many others that might be referred to, are of the same character. The multitude of cases of this character, in which no question has been made as to the power of the corporations to make such disposition of their stock, considered in connection with the well known strictness of the law of corporations, and the ability and acuteness of the profession, usually *not unwilling to raise any question upon which there is any hope of success*, is entitled to more weight, against the position here contended for, than a limited number of positive adjudications.

But reliance is placed upon several cases which have held, that where, by statute, commissioners were appointed to take subscriptions, preliminary to the organization of a corporation, and were required to receive a specified sum at the time of subscription, that a subscription taken by them without a compliance with that condition, would be invalid. These cases are the following: *Hibernia Turnpike Co. vs. Henderson*, 8 Serg. and Rawl, 219, and several subsequent cases in Pennsylvania, following that one. *Jenkins vs. U. Turnpk. Co.*, 1 Cai., Cases in Error, 86; and *Crocker vs. Crane*, 21 Wend., 211. It would be a sufficient answer to the argument attempted to be derived from them, to say that they are entirely inapplicable to a contract made by a corporation, after it has once acquired a legal existence and capacity to act. And

the very reasoning upon which they proceed, clearly implies that those same courts would not have applied the same rule to such a case. For the basis upon which they rest, is, that at the time of these subscriptions, the corporation which they are to organize has no existence, and that the commissioners are simply ministerial agents, clothed with no discretion or power to contract, and can only pursue the strict letter of the statute. It may well be urged, that where the law requires the payment of a specified sum as a condition precedent to the organization of the company, that its intention was that such payment should be in cash. Until that was paid there would be no corporation in existence, no authorized purpose for the accomplishment of which any other article could be received—nobody clothed with any discretion in the matter, or capacity to regulate it by contract. These cases may, therefore, be conceded to be law, and they by no means establish the proposition, that after a corporation has acquired existence and power to contract, that it may not by contract, receive in payment for stock, anything necessary for the execution of its purposes. On the contrary, the opposite inference is to be derived from them.

In *Crocker vs. Crane* it was intimated that the commissioners had no authority to receive worthless checks or uncurrent money in lieu of cash, and, it was said they could not have received " stocks or mortgages." But this was evidently placed upon the considerations we have suggested. For the learned judge who gave the opinion quoted, among other cases, that of *Goshen Turnpike Co. vs. Hurtin*, 9 John 217 ; which was an action on a promissory note, evidently given after the organization of the company, for five shares of stock. The action was sustained, and the court said " it was to be intended that the defendant had duly become a stockholder to that amount." It is not to be supposed that Judge Cowen, with his proneness to comment upon authorities, would have

quoted this case approvingly upon another point, without no-
ticing its conflict with the decision on the main point, if he
had supposed the acts of a corporation in existence, stood up-
on the same footing with the acts of the commissioners, in
taking the steps preliminary to its creation.

But it is very doubtful whether even the doctrines of these
cases is sustained by the weight of authority.   In the case of
*Jenkins vs. Union Turnpike Co.*, the decision of the supreme
court of New York, was in favor of the validity of the sub-
scription.   This decision was reversed by the court of errors,
but it is pretty evident from subsequent decisions in that state,
some of which are quoted in *Crocker vs. Crane*, that the de-
cision of the court of errors was not satisfactory.   In the case
in 8 Serg. & R., Justice Duncan dissented, and noticed the
reluctance of the New York courts to follow that decision of
the court of errors.

In *Central R. R. Co. vs. Clayes*, 21 Verm., 30, the commis-
sioners took a note for the payment required by statute on
subscription.   It was delivered by them to the corporation on
its organization, and the court held that it was valid, and its
payment might be enforced.   In *Greenville & C. R. R. Co. vs.
Woodsides*, 5 Rich., 148, while deciding the case upon anoth-
er ground, the court say expressly that they are not inclined
to admit that a note taken by the commissioners was not such
a payment as the statute required.   The case of *McRae vs.
Russel*, 12 Ire., 224, is a very strong case against the doctrine
contended for by the counsel for the mortgagor here.   There
the statute expressly provided that five dollars should be paid
on subscription, and that if not paid, the subscriptions should
be void.   The commissioners took a bond in payment.   The
court held, that by reason of the express provision of the
statute the subscription was void, but that the bond was valid.
They say, " So in this case the defendant could not have been
compelled to pay the $5 a share by force of the subscription,

yet if he and the other subscribers chose to waive the provisions thus made for their benefit respectively, and agreed, that upon his giving bond for the same, it should be taken as cash, and be admitted into the company, and he deliberately does so, it is not seen that any principle of law or justice is violated, or that there is any reason why he should not pay this as much as any voluntary bond."

It is very doubtful therefore, whether the weight of authority is not against the doctrine of these cases, but even if conceded correct, they do not support the position contended for. See also Redfield on Railway, 87, 88.

The cases already referred to, and a number of others cited on the plaintiff's brief, sustain fully the proposition, that a corporation may receive a note in payment for stock, and that having done so, they cannot refuse the party giving it the privileges of a corporator. In *R. R. Co. vs. Hickman,* 28 Penn. St., 318, it is expressly decided that the provisions of the statute concerning the powers of the commissioners are not applicable to the acts of the company after it is organized. And that under the general power to prescribe the manner of paying for stock, and to make contracts, &c., it may take payment in labor, materials, or anything necessary for the building of the road. In *Carr vs. LeFevre,* 27 Penn. St., 413, it was held that a transfer of land to be used for the purposes of the corporation, was a good payment for stock. In *Brown and Brothers vs. Illius,* 29 Conn., 84, the entire stock of a corporation had been paid for in real and personal estate necessary for the use of the company. The court below charged that it was a valid payment, and though the supreme court did not find it necessary to decide the point, they say they are "strongly inclined to think there was no error on that point." In the case of *Treadwell and another vs. Salisbury Man. Co. and others,* 7 Gray, 405, it was held that where the circumstances of an existing corporation justified the sale of its en

tire property, its taking payment in the stock of a new corporation did not render the transaction illegal. The court said, "the new stock is taken in lieu of money, to be distributed among those stockholders who are willing to receive it, or to be converted into money by those who do not desire to retain it." In the *Cincinnati R. R. Co. vs. Clarkson,* 7 Ind., 575, it was held that the company had power to take subscriptions for stocks payable in real estate, though the case does not show what were the provisions of the charter.

We are satisfied therefore, that the authorities utterly fail to sustain the position here contended for, that this company had no power to dispose of its stock for anything except money. But that, on the contrary, they show with entire unanimity, as well by silent acquiescence as by positive adjudication, that it had the power to dispose of it in such a manner as would accomplish the objects authorized by the charter.

It was said that taking the mortgage was an unwarrantable dealing in real estate, but this is not so. There is nothing in the transaction approaching a speculation in lands. The mortgage is taken as a mere security, and as such is only an incident to the debt. It is simply obtaining, by contract what the company could obtain by operation of law on any ordinary stock subscription. Where there was default in payment, judgment could be recovered, which would be a lien on real estate. It would be a mere means of collecting the debt, and the mortgage was nothing more. Suppose such a suit brought, could not the company settle it on the party's securing the debt by mortgage? Could they not take from a willing party, by contract, what the law would give them against him if unwilling, that is, a security for the debt on his real estate? We can see no reason to doubt it. And if they could do it on the settlement of a suit, there is no more objection to it in the first instance, without suit. Ang. & Ames on Corp., § 156.

Clark vs. Farrington.

But it is further said that such a contract is a fraud on the cash-paying subscribers. It is a sufficient answer to say that those subscribers do not complain. If the transaction is liable to no other objection, a party to it cannot set up his own fraud to defeat his contract, when the party defrauded choses to acquiesce. Redfield on Railways, 87, 88, and note. But we are unable to perceive that the objection is valid. The directors are the agents of the stockholders, and their acts, within the powers conferred, are binding on the latter. This mode of receiving payment for stock was directed by them, and it being within the scope of their authority, it was to be deemed assented to by all. It is to be assumed that the company could negotiate the securities for their present worth, which would be equivalent to the full amount paid in successive instalments.

We are therefore clearly of the opinion, that the company had power to make this contract, and that the securities are valid. It was not an attempt to go outside of its charter and accomplish things unauthorized, but was a means of executing the powers granted, as to which, except so far as positively restricted, the company possessed the powers of an individual. Says Justice Nelson, in *Wilmarth vs. Crawford*, 10 Wend., 342: "Unless there is some express restriction, either in the charter or some other act of the legislature, as to the nature of the evidence of the debts due to or from them, or securities to be taken or given by them, they have in this respect the same powers that belong to individuals. Corporations, while acting within the scope of their authority under the act creating them, that is, in the execution of the powers granted to or duties imposed upon them by the charters, are to this extent and end like natural persons." And our whole conclusion is only an application to corporations of the rule familiar as between individuals, that securities may, by contract, be received in payment.

The court below erred in holding these securities invalid, and the judgment must be reversed with costs, and the cause remanded for further proceedings.