| 54 | 159 |
|----|-----|
| 93 | 646 |
| 54 | 159 |
| 98 | 222 |
| 54 | 159 |
| 114 | 578 |

THE STATE ex rel. PRIEST vs. THE REGENTS OF THE UNIVERSITY OF WISCONSIN.

*December 19, 1881 — January 10, 1882.*

UNIVERSITY OF WISCONSIN. *Powers of the board of regents in respect to the exaction of fees from students.*

1. The board of regents of the state university, as a corporate body, has no powers except such as are conferred upon it by statute, either by express language or by fair implication.

2. All the acts of the legislature relating to the university, construed together, conclusively establish a legislative intent that, under the general grant of power to make laws for the government of the university, the grant of "all the powers necessary or convenient to accomplish the objects and perform the duties prescribed by law," and other like grants in successive statutes defining the functions of the board, it should take the power to exact fees from students, for admission, instruction and the incidental expenses of the university, except as such power was, from time to time, expressly limited.

3. Sec. 388, R. S., which provides that no student who has been a resident of the state for one year next preceding his admission to the state university, shall be required to pay "any fees for tuition" therein, except in the law department and for extra studies, must be construed as prohibiting only fees for instruction, and not charges made to meet incidental expenses.

4. The heating and lighting of public halls and rooms of the university are necessary and convenient for the accomplishment of the objects of the institution; and the general powers granted to the board of regents authorized it to enact the existing by-law, under which there is exacted from each student in attendance a fractional share of the expense of such heating and lighting, as a part of the incidental expenses.

MANDAMUS. The case is thus stated by Mr. Justice CASSODAY:

"This is a demurrer to the return of the president of the board of regents of the university, made for and in behalf of said board, to an alternative writ of *mandamus* issued on the petition of *Edward B. Priest.* It appears, in effect, from the petition and the writ, that the relator, being a member of the

senior class of the university, in regular standing, was present with his class from September 7, 1881, to September 19, 1881, when he was excluded by the faculty, or a portion of them, acting under and in pursuance of a resolution adopted in June, 1881, by the board of regents;[1] that he had fully performed all the conditions requisite to entitle him to admission, and all that were required of him, except the payment of four dollars, which sum was charged to him (and all other students except members of the law class) for incidental expenses, and was exacted as a condition of admission, but which he refused to pay, for the reason that such charge was intended to compel resident students of the state to pay tuition under the name and in the guise of incidental expenses, and hence was forbidden by law, and that the board had no right or power to exact the same.

"The return, in effect, admits that the exclusion was upon the sole ground of non-payment of the four dollars charged for incidental expenses, as stated, but denies that the same was in any sense tuition, and insists that the purpose of such charge was to require both resident and non-resident students to contribute, in part, towards the payment for fuel and material to warm and light the public rooms of the university, including rooms for public exercises, literary societies, gymnasium, and the like, for the services of janitors to care for such rooms and students' rooms, and to render occasional personal services to students, and for various other expenditures naturally incident to the conduct of the university, but no part

---

[1] The resolution was in the following words: "*Resolved*, That henceforth, until further ordered, there shall be collected from each and every student in attendance upon the university, except those in the law department, the following charges for incidental expenses, to wit: four dollars for the fall term, four dollars for the winter term, two dollars for the spring term, payable in advance at the beginning of each term, or at the time of entry of the student therein, in addition to all other fees and charges; provided, that if a student enter after one-half of any term shall have passed, he shall be required to pay but one-half the charges aforesaid, for such term."

of which goes for expenditures in the payment of professors, tutors, or the instructional force, or towards the maintenance of the means by which instruction or tuition is given to students; that the total of all the charges imposed by the board in June, 1881, for incidental expenses, on the basis of the attendance of students for the present year or any past year, is not equal to one-half of the amount which the regents will actually expend for fuel and lights for the public rooms of the university, and for incidental expenses of the nature stated; that the whole amount which can be collected from students for incidental expenses for the year 1881–2 cannot exceed the sum of $3,500, whereas, the amount necessarily expended for fuel alone to heat the several recitation rooms, halls, and other rooms used by and for the students in the manner above mentioned, will exceed $4,500.    These facts, and many others — some of which will be referred to in the opinion,— are all admitted by the demurrer."

For the demurrer there were briefs by *Olin & Grinde,* as attorneys for the relator, and a separate brief by *S. U. Pinney,* of counsel, and the cause was argued orally by *Mr. Olin* and *Mr. Pinney.*

*Wm. F. Vilas,* of counsel, for the respondent.

[From the nature of the questions discussed in the elaborate and able briefs in this cause, turning largely upon the construction of legislative acts, it has been found impossible to report the arguments so as to do them even approximate justice in the space which could properly be allowed for that purpose in this volume.]

CASSODAY, J.    The educational system of this state had its origin in certain grants of land from the national government, and was secured to the people by our state constitution.    Article X.    It consists of common or district schools, academies and normal schools, and a state university, with such colleges to be connected therewith from time to time as the interests of

The State ex rel. Priest vs. The Regents of the University of Wisconsin.

education may require.   Section 3 of that article requires that such district schools "shall be free and without charge for tuition to all children between the ages of four and twenty years."   No restriction as to fees or charges to be paid by students in academies, normal schools, the university, or any of the colleges to be connected therewith, having been imposed by the constitution upon the law-making branch of the government, the state was left perfectly free, and is at liberty to regulate, control, or prohibit altogether such fees and charges by legislative enactment.   This will not be denied, for it is a familiar and well-established principle of constitutional law that "the state legislature may exercise all legislative power not delegated to the general government, nor restricted nor reserved to the people by the state or national constitution." *Wis. C. Railroad Co. v. Taylor County,* 52 Wis., 37, and cases there cited.   Besides, the fact that there is a constitutional restriction in regard to fees and charges for tuition in district schools, but none as to the university or any college connected therewith, pretty clearly evinces an intent to leave the legislature unrestricted, in that regard, as to the university and its colleges.   The precise question raised by the demurrer, therefore, is whether the four dollars charged for incidental expenses is authorized by the statute.

Section 388, R. S., provides that "no student who shall have been a resident of the state for one year next preceding his admission, shall be required to pay any fees for tuition in the university, except in the law department and for extra studies. The regents may prescribe rates of tuition for any pupil in the law department, or who shall not have been a resident as aforesaid, and for teaching extra studies."   There is no pretense that the charges in question were for extra studies, nor that the relator was in the law department, or not a resident of the state for more than a year next preceding his application for admission.   The simple question is, therefore, in the language of the petition, whether the charge exacted was "under the

name and in the guise of incidental expenses," but in "fact to pay for tuition." If it was, then the prohibition cannot be doubted. If it was not, then it remains to be seen whether there was authority to make the charge under the statute. Can we hold that "incidental expenses," as defined, are covered by and included in the word "tuition," and hence within the prohibition of the statute?

In determining this question the meaning of the word "tuition" has an important bearing. Not necessarily so much the significance given to it as used and applied to district schools in the constitution, nor as defined at different periods by philologists, but as expressive of the legislative intent in the section of the statute quoted. As an aid in discovering such intent, we may consider the sense in which the word "tuition" had been used by the officers and faculty of the university prior to such legislative enactment; for the legislature must be deemed to have had in view such use when they passed the inhibition in question. It appears that for each year during a period of eighteen years, from 1848 to 1866, the statutes restricted the charge for tuition to a certain amount named, which was varied from time to time by the board of regents. During that period every student was required to pay a certain amount as tuition. With certain exceptions and qualifications, the same was true for the ten succeeding years and down to 1876. In each year for the same period of twenty-eight years, the officers and faculty were accustomed to exact, in addition to such tuition, certain charges under the different names of admission fee, matriculation fee, incidental fee, and charges for fuel, light, etc., for the public rooms and halls of the university.. The amount of these charges in the several years, and the names under which the same were exacted, varied from time to time. In the catalogue published in October, 1875, the charges exacted were for tuition, heating and lighting the university hall and public rooms, music, each diploma, and a matriculation fee in the

law department. With knowledge of this schedule of charges, as we must assume, the legislature provided that after July 4, 1876, "no student or candidate for admission to the university of Wisconsin, who shall have been a resident of the state of Wisconsin for one year last preceding his application for admission to said university, shall be required to pay any fee for tuition therein; but this provision shall not apply to students taking extra stud:es (so called), nor to students in the law department." Section 5, ch. 117, Laws of 1876. The substance of this section was reënacted in the Revised Statutes, being section 388 above quoted.

It will be noticed that this prohibition is confined to fees for tuition, but is silent as to the other charges named in the catalogue then regulating the same. Can this silence as to a portion of the charges named in the catalogue, and the express inhibition as to another, be construed as an intent to prohibit the exaction of the charges not mentioned as well as the one expressly named? Can it be fairly held' that such silence was by inadvertence or mistake, and not inten:ional? If so, would the legislature be likely to make the correction, or remain silent, after their attention had been called to the subject? But all the charges (except tuition to resident students) were continued right along, not only after the act of 1876, but until after the present revision of the statutes. Thus we find that, notwithstanding two catalogues were published, containing similar charges to those complained of, after the act of 1876, and prior to the Revision, yet the Revision contained no prohibition against such charges, but only against tuition. A maxim of the law, often quoted, seems, therefore, to be peculiarly applicable: "*Expressio unius est exclusio alterius*." The long-continued use of the word "tuition" by the officers and faculty of the university, and other similar institutions, as stated in the return, and the legislation had in respect to it, leaves no doubt in the mind of the court that the words of the statute, "no student [except as stated] shall

be required to pay any fees for tuition in the university," simply mean that no student shall be required to pay anything for instruction or teaching in the university; and this view is strengthened by the exceptions contained in the section of the statute quoted. For while the prohibition against paying "fees for tuition" is excepted from the law department and for extra studies, it is expressly provided that "*rates of tuition*" may be prescribed "for any pupil in the law department, or who shall not have been a resident, as aforesaid, and for *teaching* extra studies." If the "rates of tuition" thus allowed in the cases excepted from the prohibition were intended to cover "teaching" only, then it is difficult to understand upon what theory of construction "fees for tuition" should not also be restricted to charges for teaching, in contradistinction to the other classes of charges which the officers and the faculty have annually been allowed to exact for a third of a century. We must therefore hold that the statutory prohibition against exacting "fees for tuition," does not include nor reach the incidental expenses for heating and lighting public halls, etc., complained of.

One question remains to be considered: Was the board of regents authorized by the statute to make the charge exacted as incidental expenses? They and their successors in office constitute a body corporate. Section 379, R. S. We agree with counsel for the relator that the board of regents, as a corporate body, has no powers except such as are conferred upon them by statute, either by express language or by fair implication. We agree, also, that the extent of the powers granted must be ascertained from all the provisions of the statute relating to the subject, and that such provisions should be construed in the light of each other, in order the better to comprehend the intention which the legislature had in view. What the legislature said, and the circumstances under which they said it, are of special significance in determining such intent. We agree, also, that the board has no power outside

of legislative grant, and by mere usage, custom, convenience, or necessity growing out of a depleted treasury, to exact charges from those in attendance as students. The board is a creature of law, and hence cannot rise above the law, nor be a law unto themselves, in matters outside of the scope of the powers granted to them. But this does not mean that it can do no act except such as is specifically mentioned in the statute. It would be altogether impracticable to prescribe by statute the numerous and varying duties of such a board. Much must necessarily be implied from the character and objects of the corporation, the nature of the trust imposed, and the general powers granted. It will be noticed that the statute in relation to tuition is in the negative form. Prior to 1876 it prohibited the exaction of tuition in excess of the amount named, and after that date it made the prohibition absolute, with certain exceptions, which were in the late Revision put in an affirmative form. It was not so much a grant of power as a restriction upon the exercise of power. The question, therefore, recurs, Did the board have the right and power, prior to the present Revision, to exact any charges whatever not expressly prohibited, and, if so, by what statute was it conferred upon them?

By the act of 1838, No. 99, the government of the university was given to a board of visitors, who, with their successors, were declared to be a body politic and corporate, with perpetual succession, and with power, from time to time, to establish such colleges, academies and schools, depending upon said university, as they might think proper, and as the funds of the corporation might permit. And it was thereby made the duty of the board " to make such by-laws and ordinances, not inconsistent with the laws of the United States or of the territory," as they might judge most expedient for the government of such schools, academies and colleges, or for the accomplishment of the trust thereby reposed; but the act was entirely silent as to charges against students. By the act of

July 26, 1848, the government of the university was vested in a board of regents, who, with their successors, were thereby made a body corporate, with the usual powers. It was thereby also made the duty of the board, and it was especially empowered, to enact laws for the government of the university, to elect a chancellor and appoint the requisite number of professors and tutors, and such other officers as they might deem expedient. Section 7. The university was thereby made to consist of four departments. Section 8. The act nowhere in express terms empowered the board to exact charges from any student, but on the contrary such power was assumed to exist, and was thereby expressly limited in the following language: "The fee of admission to the university shall never *exceed* $10, and the charges for tuition in the *first* and *fourth* departments shall never *exceed* in one year to the residents of the state $20." Section 10. That section and the whole act were reënacted by chapter 18, R. S. 1849, and again reënacted by chapter 21, R. S. 1858, and continued to be the law of the university until 1866. It is true, this limitation was accompanied by a promise that tuition should be free in those two departments as soon as the income of the university would permit; but this clearly implies that the legislature then understood that tuition was not free in either of those departments, notwithstanding no authority had been given by express words to exact it.

From whence did the board, under those acts, get the right and power to exact tuition in their discretion in the second and third departments, and a limited admission fee in all departments, and a limited tuition fee in the first and fourth departments, unless it was included in the general grant of power already referred to? The board had no right or power, under either of those acts, to impose charges for admission or tuition upon any student in any department, unless it was derived from and included in the general powers therein granted. Why did the legislature, in those enactments, limit the amount of the

admission fee and tuition fee in the first and fourth departments, unless they understood that by the same acts they had conferred upon the board the right and authority to exact from students such admission and tuition fees? Was the legislature guilty of the folly of limiting the exercise of a power never granted? The intent to give authority to exact such charges, by the general words employed, is therefore conclusively established by the limitation put upon the exercise of such right by the same legislature which made the general grant of power.

But counsel for the relator insist that while an admission fee was authorized, it was never exacted, but that others which were not authorized were exacted. The difficulty, however, with this theory is, that an "admission fee" was only mentioned in the statute by way of restricting the amount to be charged, and not by way of authorizing such charge, so that the power to impose such charge was not attempted to be given by express words, but only by implication from general words. If there was, therefore, an implied power to exact such charge for the mere admission to the privileges of the university, for a much stronger reason there was an implied power to exact charges for heating and lighting public rooms and halls common to all students, when no restriction has been put upon the exaction of such charges. It is not a question of propriety, but of power. It is not what the regents did do, but what under the statutes they had the power of doing. Their acts of themselves prove nothing, but are significant only as they serve to elucidate the intent with which general words in the statute were employed. The intent of the legislature being thus established, the general grant of power to the board seems to have been sufficiently broad during those eighteen years to include the exaction of charges from students except as expressly limited.

It is true that while chapter 114, Laws of 1866, reörganiz-, ing the university, conferred upon the board substantially the same general powers as before, yet the language in regard to

JANUARY TERM, 1882.      169

The State ex rel. Priest vs. The Regents of the University of Wisconsin.

an admission fee and rates of tuition are permissive in form, with exceptions, instead of being negatively expressed, as previously; but the change was merely in phraseology, and in no way indicated an absence of belief in the previous existence of the power to exact charges. This view is confirmed by chapter 117, Laws of 1876, which is silent on the subject of admission fee, but simply prohibits fees for tuition to resident students, except in the law department and for extra studies. The power to impose tuition upon non-resident students, students in the law department, and for extra studies, was not derived from that chapter, but existed outside and independent of it. But, as we have shown, the prohibition in this chapter against exacting a tuition fee from resident students in no way trenched upon the right to impose the other charges previously exacted.

Under the Revised Statutes the government of the university is still vested in a board of regents, who, with their successors in office, constitute a body corporate, and are declared to "possess all the powers necessary or convenient to accomplish the objects and perform the duties prescribed by law," with power to "enact laws for the government of the university in all its branches." We are to remember that it is not a contract with enumerated details that we are construing, but a charter granting power to "govern" a university, and to "enact laws" for that purpose. These terms are in themselves of sweeping import; but they are accompanied by still others, professing to confer "all the powers necessary or convenient to accomplish the objects and perform the duties prescribed by law." This clause is quite similar to the last clause of section 8, art. I, Const. U. S., which gives to congress power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers."

It was held at an early day, by the supreme court of the United States, that this clause gave to congress the choice of the means to be employed, provided only that the means selected came within the scope of the constitution and were

legitimate to the end sought; and that a national bank was such a means, though not named in the constitution. Opinion by MARSHALL, C. J.: *McCulloch v. Maryland,* 4 Wheat., 411–425. Implied power is an incident of general power granted, and is peculiarly applicable to corporations governed by boards of regents, trustees, directors, and the like. This court has held that, "in determining the powers of a corporation, the rule is, if the means employed are reasonably adapted to the ends for which the corporation was created, they come within its implied powers, though they may not be specifically designated by the act of incorporation;" and that it is "entitled to choose among the means convenient and adapted to the end contemplated by its charter." 5 Wis., 173; *Clark v. Farrington,* 11 Wis., 306; *Blunt v. Walker,* id., 334. By parity of reasoning it may be said, that it is for the board of regents to choose the means which in their judgment are necessary or convenient, provided only they are calculated to accomplish the objects sought by the charter and within the scope of the general powers granted, and not in conflict with the statute. These are some of the general powers conferred upon the board. Sections 378, 379, 381, R. S. Certainly there is no indication here of any purpose to diminish the general powers previously possessed, but rather to increase and broaden them.

Counsel for the relator concede that prior to the legislation of 1876 the regents had the power to charge an admission as well as a tuition fee. But, as we have shown, if such power was implied and then expressly restricted, why is there not the same reason for holding that the power to exact charges for heating and lighting public halls and rooms, under the head of incidental expenses, was also implied, though not restricted. If, therefore, the powers previously existing were broad enough in their scope to include the exaction of the charges made for so many years, except as expressly limited, then there would seem to be no doubt of the right, under the general powers granted, to continue the exaction of the same charges,

except in so far as the exercise of such right has been expressly restricted or prohibited. If, prior to 1876, there was a manifest intent on the part of the legislature to clothe the board by general language with power to exact charges for heating and lighting such public rooms and halls as were common to students, as well as fees for tuition, then, did the mere restricting of the right of imposing tuition fees take away the intent to authorize the other charges? If it did, then where shall we fix the dividing line? If there is no power to impose charges upon students for incidental expenses — for heating and lighting public halls and rooms,— then is there any power in the board to rent to students private rooms, or to charge them with the use of chemicals, and the like? But counsel for the relator admit that the regents may charge students rooming in the dormitory room rent, and for heating the same; that they may charge students pursuing the chemical course the cost price of the materials consumed by them in making experiments. But where do they get the power to rent a single room to one, and collect rent therefor, unless it be implied from the general powers granted; and, if so implied, what word or language would include such renting, or the use of such chemicals, or the cost of such materials, and yet exclude the right to charge each student a fractional share of the expense incident to heating and lighting one hall or room for the common use, benefit and convenience of all the students?

Perhaps this discussion has been unnecessarily extended, but the question involved is of some public interest, and we have therefore deemed it to be our duty to pretty fully indicate the views we have taken of the powers conferred by the statutes upon the board of regents in respect to the points involved.

After listening to the able arguments of counsel, and giving the subject very careful consideration, we must conclude from the facts stated in the return, and the reasons given, that the heating and lighting of public halls and rooms of the university is an expense necessary and convenient to accomplish

the objects mentioned in the statute, and that the general powers granted to the board of regents authorized them to enact the by-law in question, and under it to exact from each student in attendance a fractional share of such expense as incidental expenses.

*By the Court.*— The demurrer to the return to the alternative writ of *mandamus* is overruled.