STATE ex rel. VEEDER, Relator, v. STATE BOARD OF
EDUCATION et al., Respondents.

(No. 7,276.)

(Submitted May 1, 1934. Decided May 24, 1934.)

[33 Pac. (2d) 516.]

*Mr. J. C. Garlington,* for Relator, submitted a brief and argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Howard Toole,* for Respondents, submitted a brief; *Mr. Toole* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The relator, William Veeder, as a taxpayer and student at the University of Montana, seeks to enjoin the state board of education and the members thereof from proceeding with their perfected plan to erect and maintain a students' union building at the State University in the city of Missoula.

Relator's petition alleges that the respondents are threatening to, and unless restrained will, incur debts, obligations and liabilities against the state, the University, and the student body, contrary to the Constitution and laws of Montana; it sets forth the plan and the authority under which the board intends to finance, erect, equip and operate the building. On the filing of the petition an order was issued out of this court commanding the above-named respondents to show cause why a writ of injunction should not issue. The respondents filed an answer admitting the facts alleged, and joining issue only as to the questions of law presented. Briefs were filed and oral argument had, and the matter is now before us for determination.

From the record we find the following facts: In November last the Governor called a special session of the legislature to enact laws to meet emergencies arising out of the depression, and particularly to enable this state to take advantage of the benefits afforded by the "National Industrial Recovery Act," which permits the advance of federal funds for the construction of public works (48 Stat. 195). Chapter 10 of the Laws of the Extraordinary Session of 1933 empowered the state board of education to erect student union buildings at the several educational institutions under its control, and authorized it to finance such projects in conformity with the federal Act, or otherwise, but expressly prohibited the board's creating any debt or obligation against the state, and declared that "all such obligations, including principal and interest, shall be payable solely from funds from the operation of the * * * buildings and from the income derived from

student fees or from gifts or bequests made to the respective institutions * * * for students' union building purposes.'' Declaring the existence of an emergency, the legislature provided that the Act should take effect immediately upon its passage and approval.

It appears that the University is without adequate auditorium facilities, and that a students' union building has long been desired at Missoula. The State University has always exacted from the students matriculation, registration and certain other fees, and, in 1929, the student body voted to increase the students' fees by $1 a quarter for the purpose of creating a fund with which to erect such a building. This fee has been collected each year and impounded in a special fund for that purpose.

Acting under the provisions of Chapter 10, above, the state board perfected a plan, approved by the federal government, for the erection of a suitable building at Missoula which will house an auditorium, students' store, dance hall, office space and other accommodations, to be rented to student groups and others. Classes in dramatic art and perhaps other subjects will be conducted within the building. The erection of this building is to be financed by a loan of $240,000 from the federal government, for which the board will issue bonds amortized over a period of thirty years, and a grant by the government of $60,000.

To provide in part for the upkeep of the building, the payment of the interest, and the creation of a sinking fund for the retirement of the bonds at maturity, the board by resolution fixed a student union building fee of $5 per student per year, to be paid as a condition precedent to enrollment by each applicant for admission to the University, and declared that such fee shall never be decreased so long as any of the bonds are outstanding. By a ''loan agreement'' with the federal government, the proceeds of this fee charge, with the special fund on hand, and all of the rents, revenues and income from the building, when completed, are pledged for the payment of the principal and interest on the bonds, and

thereby the board binds itself to fix, maintain and collect fees and rentals for the facilities afforded, "which shall provide revenues sufficient at all times: (a) to pay the current reasonable expenses of operation, maintenance and repair of the building, including insurance," and (b) "to establish and maintain a special fund, which * * * will be sufficient for the payment of the interest * * * and to maintain an adequate reserve." .

These funds must be deposited and maintained in the office of the state treasurer, and a sufficient amount for necessary expenses is to be placed in the "Operating and Maintenance Fund," and "after making all payments into the Operating and Maintenance Fund * * * the remaining gross revenues received in each fiscal year shall be * * * paid into the sinking fund until the amount so set aside * * * in each fiscal year shall equal one hundred ten per cent. of the aggregate amount of principal and interest upon the bonds becoming due" each year. Any excess shall be held as a reserve for contingencies.

The agreed estimated revenues from the students' union building fees, and rents and income from the building, will be $16,600; the amount necessary annually for the payment of principal and interest on the bonds, or paid into the "sinking fund," $11,500, so that there will be available for the operating and maintenance fund and reserve, $5,100.

While the board has agreed to fix and maintain fees and rents at a level to supply the needs of both funds "at all times," by resolution it has declared that "if the revenues of the building in any year shall not be sufficient to make the payments hereabove required to be made, * * * the board will pay the expense of furnishing heat, light, power and water from other funds under the control of the board."

The cost of the building will be $300,000, of which $167,000, approximately, will be spent for materials, and $123,000 for labor; this latter amount, we are told, will furnish about 175,000 man hours of labor, exclusive of labor going into the preparation of materials, plans and specifications. Under the

provisions of Chapter 10, "Montana labor shall be given preference," and the wages of the men employed shall not be less than prescribed by the federal government for such work.

The first question, logically, for determination is that raised ▮ by relator's allegations to the effect that no emergency existed at the time Chapter 10 was enacted, and that the period for reference to the vote of the people has not expired, and that he is circulating a petition for a referendum of the Act.

In so far as applicable here, section 1 of Article V of our Constitution provides that: "The people reserve to themselves power * * * to approve or reject at the polls, any act of the legislative assembly, except as to laws necessary for the immediate preservation of the public peace, health, or safety." It will be noted that this provision vests no power in the legislature, but merely excepts from the reserved power of the people those laws which are, in fact, necessary for the immediate preservation of the public peace, health and safety, and the question as to whether a particular law falls within the reservation or the exception is a question of fact to be determined as are other facts, that is, by the court on the showing made. In determining this question, the court may look to the Act, the history of the legislation, contemporaneous declarations of the legislature, and the evil to be remedied; and, in case of doubt, it should be resolved in favor of the people.

This exemption was not intended to extend further than to matters arising out of some unforeseen menace, calamity, accident, sudden emergency, extraordinary occurrence or unprecedented climatic condition, rendering immediate action imperative. (*State ex rel. Goodman* v. *Stewart,* 57 Mont. 144, 187 Pac. 641.)

Aside from common knowledge, in the record before us we ▮ find evidence of the great and sudden economic depression which set in throughout the country in the late fall of 1929 and had abated but little at the time this Act was passed; of the desperate plight of the millions of unemployed, of which we have our thousands; of the words of the President of the United States, calling attention to the great emergency neces-

sitating the passage of the National Industrial Recovery Act, and the words of our Governor in calling the special session for the purpose of enacting this and other laws, that:

"Whereas, The nationwide economic depression has created a serious emergency in this state, due to the widespread unemployment and consequent indigence and dependence of a large portion of the people of the state; and

"Whereas, Great distress exists within the state of Montana, and many citizens are without employment, without means of support and unable to care for themselves and their families; and Whereas, The Congress of the United States has enacted * * * the 'National Industrial Recovery Act' which permits the advance of federal funds for the construction of public works in the several states; and Whereas, It is necessary that the Legislative Assembly of the state enact legislation whereby the state and its subdivisions and the citizens thereof may avail themselves of the benefits of such legislation; and * * * Whereas, In the opinion of the Governor it is imperative that legislation be enacted immediately to relieve the needy and destitute citizens of this state from want and deprivation by the provision of direct relief or work relief, or both; to co-operate with the federal Government in the program of national recovery and to prevent disaster in the critical emergency. * * *

"Now Therefore, I, F. H. Cooney, Governor, * * * do hereby convene the * * * Legislative Assembly * * *

"To authorize and empower * * * any agencies of the state to obtain grants, loans or advances from the United States * * * for the construction * * * of any public works project authorized by the National Industrial Recovery Act, * * * to construct, finance or aid * * * such public works project; to borrow money; to issue bonds, * * * enter into contracts, * * * and to provide for the repayment of any loans made."

It required no prescience to predict a situation in this country as cataclysmic as earthquake, deluge or even foreign invasion, had not the governments, federal and state, acted

promptly to relieve the acute financial, industrial, and labor conditions existing, and from which a dangerous state of mind was developing among men willing and anxious to earn a living for themselves and their families, but unable to secure work sufficient to provide the common necessities of life.

In the preamble to the Minnesota Mortgage Moratorium Law (Laws Minn. 1933, Chap. 339), after reciting the lamentable conditions prevailing and declaring that an emergency existed, the legislature declared that "the inherent and fundamental purpose of our government is to safeguard the public and promote the general welfare of the people." In sustaining the Act, the supreme court of Minnesota, speaking through Mr. Justice Olsen, said: "It is suggested that an emergency arising from a financial and business crisis does not authorize emergency laws * * * for the protection of the public welfare, because financial and business crises are recurring events and to be anticipated; that an emergency, for legislative purposes, must be one arising from some extraordinary and unexpected catastrophe. * * * The reason why a flood or an earthquake may create an emergency is not because they are catastrophes of nature, but because of their widespread destruction of the property and homes of thousands of people, causing want and suffering. * * * The present nation wide and world wide business and financial crisis has the same results as if it were caused by flood, earthquake, or disturbance in nature. It has deprived millions of persons in this nation of their employment and means of earning a living for themselves and their families; * * * it has resulted in such widespread want and suffering among our people that private, state, and municipal agencies are unable to adequately relieve the want and suffering, and Congress has found it necessary to step in and attempt to remedy the situation by federal aid. * * * To say that economic crises are to be anticipated is no good ground for making any distinction. * * * The test of an emergency is not the cause thereof but the resulting public want, suffering, and danger." (*Blaisdell* v. *Home Building & Loan Assn.*, 189 Minn. 422, 249 N. W. 334, 340, 86 A. L. R.

1507.) The case was appealed to the Supreme Court of the United States, and there affirmed in January of this year, 290 U. S. 398, 54 Sup. Ct. 231, 235, 78 L. Ed. 413, 88 A. L. R. 1481, and in upholding the law as an emergency Act, Mr. Chief Justice Hughes quoted, in part, the reasons given by Justice Olsen, and said: ''While emergency does not create power, emergency may furnish the occasion for the exercise of power. 'Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed.' (*Wilson* v. *New*, 243 U. S. 332, 348, 37 Sup. Ct. 298, 302, 61 L. Ed. 755, Ann. Cas. 1918A, 1024, L. R. A. 1917E, 938.) The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions.''

The provision, therefore, for this ''work relief'' clearly falls within the emergency clause of our Constitution. The proposed project will give employment to a substantial number of men included in the term ''Montana labor,'' and it would be a travesty upon the intent of the framers of the constitutional amendment to say that, with such dire conditions facing the state, its officers and agents must sit supinely by for six months after the passage of such an Act in order to determine whether or not the people, or a small percentage thereof, desired to ''accept or reject'' the benefits afforded at the next general election.

The legislature was justified in declaring that, in the emergency existing, this Act was necessary for the preservation of the public peace, health and safety; but complaint is made that, as the provision reads ''for the immediate preservation,'' and the legislature did not require the state board to act immediately, the Act does not come within the provision.

This court has had occasion to comment on the use of the word ''immediately'' in a statute, and has intimated that even this adverb may have some elasticity (*Putnam* v. *Putnam*, 86 Mont. 135, 282 Pac. 855); however, the meaning of the two, ''immediate'' and ''immediately,'' is not the same. ''The

word 'immediate,' as defined by Worcester, means, 'having nothing intervening, either as to place, time or action.' The word 'immediately' means 'instantly, directly, without delay, forthwith, just now.' '' (*Elliott* v. *Keith,* 32 Mo. App. 579.) "Immediate" is of relative signification. "It is never employed to designate an exact portion of time. It is used with more or less latitude by universal consent, according to the subject to which it is applied." It "is sliding from its instantaneousness, so that we are fain to substitute 'at once,' 'instantly,' etc., when we would make promptness emphatic." (*Employers' Liability A. Corp.* v. *Light, H. & P. Co.,* 28 Ind. App. 437, 63 N. E. 54, 55.) In the phrase "immediate notice," it means within a reasonable time. (*Aetna Indemnity Co.* v. *Crowe Co.,* 154 Fed. 545, 83 C. C. A. 431; *Perkins* v. *Oxford Paper Co.,* 104 Me. 109, 71 Atl. 476; *Southern Surety Co.* v. *Heyburn,* 234 Ky. 739, 29 S. W. (2d) 6. See, also, *Western Min. Co.* v. *Quinn,* 40 Mont. 156, 105 Pac. 732, 28 L. R. A. (n. s.) 214, 135 Am. St. Rep. 612, 20 Ann. Cas. 173; *Chicago etc. Ry. Co.* v. *Alexander,* 47 Wash. 131, 91 Pac. 626.)

Construing a constitutional amendment identical with ours, the supreme court of Arkansas has said: " 'Immediate,' in the sense of this amendment, means those laws that should take effect in order to conserve this purpose before the time when the people under the provisions of the amendment would have the opportunity to vote upon them. * * * The framers of amendment No. 10, and the people who adopted it, did not intend that laws necessary for the immediate preservation of the public peace, health, or safety should wait the slow processes of the referendum. * * * But the amendment does not require that laws which the Legislature determine and declare necessary for * * * [this purpose] shall be put into effect immediately." (*Hanson* v. *Hodges,* 109 Ark. 479, 160 S. W. 392, 396.)

This is the proper construction of the amendment; the emergency must exist at the time the legislature acts, but its acts need not be carried into effect immediately, and a delay on the part of the officials or agencies empowered to act

cannot defeat a justifiable declaration of the legislature that the emergency, suspending the reserved power of referendum, exists at the time the Act is passed. The circulation of the petition, therefore, is without effect; the Secretary of State would not be authorized to file such a petition if presented to him.

It is asserted that Chapter 10, above, is violative of section 33, Article V, of the Constitution, requiring that "appropriations shall be made by separate bills, each embracing but one subject." Assuming that the Act contains an appropriation, such appropriation is but an incident to the single subject of the legislation, and such inclusion is not violative of the constitutional provisions. (*Hill* v. *Rae*, 52 Mont. 378, 158 Pac. 826, Ann. Cas. 1917E, 210, L. R. A. 1917A, 495; *State ex rel. Campbell* v. *Stewart*, 54 Mont. 504, 171 Pac. 755, Ann. Cas. 1918D, 1101.)

The title to the Act, "An Act to Permit the Erection, Furnishing and Operation of Students' Union Buildings at the State Educational Institutions of the State of Montana and to Authorize the Financing thereof in Conformity with the National Industrial Recovery Act or otherwise," clearly meets the requirements of section 23 of Article V of the Constitution. (See *Arps* v. *State Highway Commission*, 90 Mont. 152, 300 Pac. 549.)

As the Act has to do only with special funds to arise from the operations authorized and in connection therewith and devoted to a special purpose, it does not violate the provisions of sections 34 and 39 of Article V, or section 10 of Article XII, of the Constitution, respecting state moneys and the appropriation thereof. (*Barbour* v. *State Board of Education*, 92 Mont. 321, 13 Pac. (2d) 225; *State ex rel. Bickford* v. *Cook*, 17 Mont. 529, 43 Pac. 928.)

The petition alleges that the Act violates other constitutional provisions cited, but the questions thus presented are not urged by brief or oral argument; suffice it to say that we have carefully considered these provisions in connection

with the Act, and find that it offends against no constitutional provision called to our attention.

Turning next to the plan adopted by the board for the ▮▮▮▮▮ construction of the students' union building at Missoula, it is first contended that the State Board of Education has no power or authority to charge a student union fee to each student, or, if such authority exists, this cannot be done without the consent of the student body, and that the attempt to do so violates section 11 of Article XI of the Constitution and the Code provisions enacted pursuant thereto. This constitutional provision merely vests control over the state educational institutions in the board, and authorizes the legislature to define and circumscribe the powers and duties of the board.

Section 836, Revised Codes of 1921, declares that the board shall have general control and supervision over the institutions named and over their buildings, grounds and other property; it authorizes the board to adopt rules and regulations for its own government "and proper and necessary for the execution of the powers and duties conferred upon it by law," and for the "regulations for the government of the affairs of the * * * institutions." This section also authorizes the board to receive from the United States, from "state boards or persons," funds, income, and property to which the institutions are entitled, and "to use and appropriate" the same for the specific purpose "of the grant or donation, and none other," and to have general control and supervision over all receipts and disbursements of the institutions.

The legislative grant of power contains no direct authorization to the board to impose fees of any kind upon the students, but it contains the restriction that "tuition shall ever be free to all students who shall have been residents of the state for one year." (Sec. 866, Id.)

The express power to manage and control the business and finances of the institutions carries with it the implied power to do all things necessary and proper to the exercise of the general powers, which would include the exaction of fees,

not prohibited, if fees are necessary to the conduct of the business of the institutions. The very fact that the legislature deemed it necessary to prohibit the charge for tuition to the class of students classified, discloses the legislative intent that the board should exact tuition fees from students other than those specified, and could, without the prohibition, exact tuition fees from all students in conjunction with other fees collected for the maintenance of the institutions. The granted powers are sufficiently broad to include the exaction of fees from students, except as expressly limited. (*State ex rel. Priest* v. *Regents of University*, 54 Wis. 159, 11 N. W. 472.)

Unless these fees are for "tuition," they stand on no different footing than matriculation, registration and other fees heretofore exacted, and require no vote of the student body for their exaction. In the orderly conduct of the business of the institution the board cannot be embarrassed by requiring it to submit such a matter to a vote; nor, if this fee can be pledged for the repayment of the loan secured, can it be possible for the students in some future year to disrupt the plan by staging an election and voting against the payment of the fees.

"Tuition" is from the Latin and has the same derivation as "tutor," from "tuto," to guard; "tutela," watching over, protection; "tutio," care over, guardianship. Thus a tutor is one who teaches; usually a private instructor; "tuition," "the act or business of teaching the various branches of learning." (*Cook County* v. *Chicago Industrial School*, 125 Ill. 540, 18 N. E. 183, 187, 8 Am. St. Rep. 386, 1 L. R. A. 437.) This definition is in accord with that given by the several lexicographers and with the common acceptation and use of the term.

The expense of conducting an institution of learning embraces many items having nothing to do with the business of teaching or the cost of instruction, among which are the cost of heating, lighting and care of buildings, which are remotely connected with teaching, as they are necessary in order to

have a fit and proper place in which to give instruction; an item of expense in the conduct of such an institution, not even remotely connected with instruction, is the upkeep of the campus.

The question as to whether fees charged students in order to defray such incidental expenses were fees charged for tuition, and thus within the prohibition of such a statute as ours, has been before the courts of a number of the states. The most recent case on the subject, and the one most nearly paralleling the present case, is *Rheam* v. *Board,* 161 Okl. 268, 18 Pac. (2d) 535, wherein the power of the board of regents of the University of Oklahoma to require the payment of a fee for construction, equipment, and maintenance of a student union building, and for the retirement of bonds issued for such construction, as a condition precedent to admission to the University, was upheld. as not within the prohibition against a charge for "tuition." In that case the court attempted to differentiate the case before it from the case of *State ex rel. Little* v. *Board,* 55 Kan. 389, 40 Pac. 656, 29 L. R. A. 378, on which the relator here relies, on the ground that the Kansas board attempted to charge a fee for the use of property belonging to the state, while the Oklahoma board fixed a fee for the use of property not belonging to the state. This distinction, we think, has little force; the Oklahoma decision discloses that the student union building was to become the property of the state when the bonds issued were retired. The true distinction is that the law of Kansas did not deal with "tuition" but provided that "admission to the university shall be free," which the court held to render the use of the state property at the university free to students, and therefore a bar to the imposition of a fee to defray any of the expenses incurred by the state on behalf of the students.

In Wisconsin, the board of regents of the University had for years charged a tuition fee and divers fees to aid in defraying incidental expenses, when the legislature passed an Act providing that "no fee for tuition" should be exacted; that court

held that the Act did not affect the right to continue the exaction of fees other than for "tuition." (*State ex rel. Priest* v. *Regents of University,* above.) And where the matter has come before the courts, generally it is held that the provisions respecting "tuition" have no relation to fees collected in aid of defraying incidental expenses of colleges and schools, such as for heat, light, cleaning or interest on bonds. (*Bryant* v. *Whisenant,* 167 Ala. 325, 52 So. 525, 140 Am. St. Rep. 41; *Linton* v. *Lucy Cobb Institute,* 117 Ga. 678, 45 S. E. 63; *Norristown Borough School District* v. *School District,* 49 Pa. Super. Ct. 561; *Loomis* v. *Callahan,* 196 Wis. 518, 220 N. W. 816, 818.)

Under the authorities and on principle, the provision respecting free tuition does not bar the state board from collecting the fee fixed here, as a condition precedent to entry into the University, from each .student in each year until the bonds are all paid, unless the board, composed of members appointed for a definite period of years, is barred from binding their successors by its pledge of the fees.

If the proposed building was to be for the housing of class-rooms, study-rooms, library facilities and the like, necessary space for the imparting and acquiring of instruction, we might not be disposed to so hold, but the main purpose of the erection of this building is to house extra-curriculum activities of the student body; special accommodations to which they are not entitled as a part of their tuition and for which they may be assessed a fee without infringing upon the provision that they shall be given free tuition. The fact that a small portion of the building · may be devoted to classes in the dramatic arts and kindred subjects does not militate against this holding.

Chapter 10, above, contemplates the fixing and collection of ▮▮▮▮▮ such fees, and requires that the proceeds therefrom shall be pledged, with the rents and revenues from the building, so long as any of the bonds are outstanding. That the plan to repay the loan obtained from the rents, income and profits of the operation of the building is not violative of any

constitutional provision, and to this extent the board may bind its successors, has been heretofore determined. (*Barbour* v. *State Board of Education,* 92 Mont. 321, 13 Pac. (2d) 225.) The pledging of the fees fixed and collected for the same purpose stands on the same footing. All governing boards exercise two distinct classes of powers; the one legislative and governmental, the other proprietary, or in the nature of business managers for the public they serve. In the exercise of the first class of powers, a board cannot bind its successors, but in the second it may enter into valid contracts extending far beyond the term of office of the members. In other words, the members of such a board cannot circumscribe the legislative powers of their successors, but as business managers they may exercise their powers in the same way and under the same rules as control a business corporation under like circumstances. (3 McQuillin on Municipal Corporations, 952; *Omaha Water Co.* v. *Omaha,* (C. C. A.) 147 Fed. 1, 8 Ann. Cas. 614, 12 L. R. A. (n. s.) 736.) Further, even though the power to be exercised is, strictly speaking, a legislative function, if the legislature authorizes a contract and the contract is made, it is valid and binding for the period of the running of the contract upon the successors of those entering into it. (*Detroit* v. *Detroit Citizens' St. R. Co.,* 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592.)

Here, as noted above, the Act under which the board proposes to pledge the student fees for the period of the bonds expressly provides therefor. However, aside from this provision, the board in arranging for the financing of the erection of the building in a manner other than that provided for the erection of buildings by the state was, we are convinced, acting in its capacity as business manager of the institution and not in its governmental or legislative capacity. The members were acting as a board and not as individual members, and the fact that the term of office of the individuals will expire before the termination of their contract does not in any way affect the validity of the contract. (*Bennett* v. *Petroleum County,* 87 Mont. 436, 288 Pac. 1018.)

As was said in *Loomis* v. *Callahan,* above, speaking of a somewhat similar plan, "The growth [of the university] continuously reveals increasing necessities, calling for construction of additional buildings and the expenditure of moneys, which the Legislature is reluctant to appropriate because of the attendant increasing tax burdens. In this situation the Legislature has applied to public necessities some of the financial genius which we find continually displayed in private business, with the thought of financing necessary undertakings by the pledging of future earnings arising from the operation of such enterprises."

Intimately connected with this question is that raised by the assertion that the Act, with the plan adopted pursuant thereto, violates the Constitution of this state, in that it attemped to loan the credit of the state in contravention of the prohibition of section 1, Article XIII thereof; to appropriate state funds for more than two years, contrary to the provisions of section 12 of Article XII thereof; to create a state debt in excess of $100,000 without submission to the people, and without complying with the requirements of section 2 of Article XIII. That no one of these constitutional provisions is violated by the Act, or by the plan adopted for the construction and financing of the building, in so far as it provides for repayment of the loan from the revenues to be derived from the operation of the project, is fairly indicated from what is said in *Barbour* v. *State Board of Education,* above, and is definitely settled by the great weight of authority. (See *McClain* v. *Regents of University,* 124 Or. 629, 265 Pac. 412; *State ex rel. Kaufman* v. *Davis,* 59 N. D. 191, 229 N. W. 105; *McDonald* v. *University,* 225 Ky. 205, 7 S. W. (2d) 1046; *State* v. *Clausen,* 134 Wash. 196, 235 Pac. 364; *Graham* v. *Childers,* 114 Okl. 38, 241 Pac. 178; *Bates* v. *State Bridge Com.,* 109 W. Va. 186, 153 S. E. 305; *Fox* v. *Bicknell,* 193 Ind. 537, 141 N. E. 222; *State* v. *Portage,* 174 Wis. 588, 184 N. W. 376; *Alabama, etc.,* v. *Smith,* 217 Ala. 311, 116 So. 695; *Kasch* v. *Miller,* 104 Ohio St. 281, 135 N. E. 813, 815.

See, also, text and cases cited in 6 McQuillin on Municipal Corporations, 48; 59 C. J. 225, and note 72 A. L. R. 687.)

However, the relator contends that even though this be so, section 2 of Article XIII of the Constitution is violated by the following provision of the "Resolution Authorizing the Issuance" of the bonds, passed by the board on April 9, 1934, to-wit, that "if the revenues of the building in any year shall not be sufficient to make the payments required * * * into the operation and maintenance fund and into the sinking fund, the board will pay the expenses of furnishing heat, light, power and water from other funds under the control of the board."

This resolution differs from the provision of the "Loan Agreement" entered into between the board and the government on March 30, 1934, on the same subject, which reads: "Nothing in this agreement shall be construed as requiring the borrower to expend any of the funds of the State of Montana for the operation and maintenance of the project, but it is the intent hereof that the borrower shall furnish adequate heat, light, power and water service without charge against the project or deduction from the gross revenues therefrom, so long as the bonds are outstanding."

The "Loan Agreement" is the solemn contract between the board and the government with reference to the repayment of the loan, but if the bonds are issued and sold, the "Bond Resolution" will become a contract between the board and the bondholders. In each of these contracts the board binds itself to exact and collect such student fees and rental, and charge for the use of the building so that the revenues therefrom will "at all times" be sufficient to meet the requirements of both the operation and maintenance fund and the bond interest and sinking fund; under the quoted provision of the bond resolution there is, at most, a contingent liability upon the board, which would attach only in the event of the failure of the board to perform its duty thus imposed. Such a contingent liability is held not sufficient to create an indebtedness within the meaning of the constitutional provision under

consideration. (*Winston* v. *Spokane*, 12 Wash. 524, 41 Pac. 888; *Kenyon* v. *Spokane*, 17 Wash. 57, 48 Pac. 783.)

A case very similar to this arose in Alabama over the issuance of bonds for the erection of a toll-bridge, the amount to be repaid from the tolls collected and, if necessary, from the surplus from the gasoline tax, after the purposes for which the tax was to be used had been served, and from the "net proceeds from the convict department." Answering the question here considered, the court said: "If these special funds should for any reason fail of realization, or should be exhausted in execution of the primary purposes for which they may be raised, nothing will be left to creditors advancing money on the faith of the bonds authorized but the right to collect tolls. There is no promise on the part of the state to pay in any event; there is no pledge that there will be a surplus of any fund; there is no pledge of the general credit of the state; there will be no debt within the meaning" of the Constitution. (*Alabama State Bridge Corp.* v. *Smith*, 217 Ala. 311, 116 So. 695, 699.) This declaration fits the present question and answers it; the provision of the bond resolution will not create a state debt or obligation within the meaning of our constitutional prohibitions.

With reference to the provisions found in the "Loan Agreement," we must bear in mind that nothing in that agreement shall be construed as requiring the board to expend any of the funds of the state for operation or maintenance charges; it is therefore apparent that the "intent" of the agreement is that the expenses of heat, light, power and water service shall be met from funds under the control of the board, other than "funds of the State of Montana." We do not hold that, were it not for this provision, after the building is completed and equipped and has become an integral part of the University plant, the cost of these necessary services could not be met as are like expenses of the gymnasium, the athletic field, and other nonteaching units of the plant, or that, if some philanthropic citizen should erect and equip such a building and deed it to the University, the board would be powerless

to put it to the use for which it was intended because of the expense of operating it. This court has held that it was not the intention of the framers of the Constitution, nor of the people in adopting it, that the debt provisions thereof should apply to the necessary and ordinary expenses of state government. (*State ex rel. Toomey* v. *State Board,* 74 Mont. 1, 238 Pac. 316.)

However, under the "Loan Agreement," these expenses are to be met from other funds than state funds. Now, where a branch of the state government proposes to acquire an additional unit of its plant, without creating a state debt or pledging the credit of the state, it may pledge to this purpose not only the revenues to be derived from the new unit, but also the revenues to be thereafter derived from other units of its plant, and so long as it does not pledge or encumber the property of the state, but merely the revenues under its control, the plan does not contemplate the creation of a debt or obligation, within the meaning of the Constitution. (*Searle* v. *Haxtun,* 84 Colo. 494, 271 Pac. 629; *Ward* v. *Chicago,* 342 Ill. 167, 173 N. E. 810; *Bell* v. *Fayette,* 325 Mo. 75, 28 S. W. (2d) 356.) This rule is recognized in *Barbour* v. *State Board,* above.

As heretofore noted, by the provisions of section 836, Revised Codes 1921, this board has "control of all receipts and disbursements" of this educational institution; what funds may come into its hands which are not "funds of the state" we are not advised.

It may be noted that, although the "Loan Agreement" declares it the intent of the parties that these services be furnished without deduction from the gross revenues of the project, there is therein provided a method by which a portion of such revenues may become a fund in the hands of the board which it may use for this or any other lawful purpose, i. e., "that no further payments need be made into said Bond Fund after the same shall have accumulated a surplus equal to three times the amount of the annual charges for principal

and interest on the bonds at the time outstanding, and to thereafter continually maintain said surplus."

As the record discloses that, at the outset, there will be at least $15,000 available from the present "Student Union Fund" and at least $7,500 collected from the students early in September, and that annual revenues from the building are estimated at $5,100 in excess of the annual amount to be placed in the bond fund, the credit to this fund, requiring but $11,500 per year, may be such as to release a substantial amount for use after the first year of operation. But whether this be so or not, these services are to be paid for from funds other than state funds, and neither the provision of the "Loan Agreement" nor that of the "Bond Resolution" is violative of the provisions of our Constitution relative to the creation of a state debt or obligation.

Again attacking the authority of the board on the basis of its resolution, it is contended that the pledging of the rents, revenues and fees is unauthorized, because the pledge contained in the resolution is for "operation and maintenance" without mentioning "repairs, replacements and betterments" provided for in the Act. Again counsel has erred in resorting to the resolution which has been superseded by the solemn contract. As above pointed out, the "Loan Agreement" follows the provisions of the Act.

With reference to the accumulation of assets in the "Student Union Building Fund" at the present time, which relator contends cannot be pledged, as the pleadings do not contain facts sufficient on which to determine the custody of this fund, counsel have filed herein a stipulation which recites additional facts. We are now fully advised as follows: Pursuant to the vote of the students in 1929, since the autumn quarter of 1930 there has been collected from each student, by the University officials, at the same time and in the same manner as other fees, $1 per quarter. The money so collected has been held in a "special fund" in the custody of the president and business manager of the University and the "local executive board" of this respondent board, and the

total fund will, pursuant to the resolution of the board, be deposited with the state treasurer on July 1, 1934, in obedience to the commands of the Act. This fund will become a part of the "Bond Fund" of the "Project." As the board has control and supervision over the finances of the University, the officials mentioned are but the agents of the board, and as this is a special fund raised for a specific purpose, to-wit, the erection of the "Students' Union Building," by the voluntary action of the student body, it is in the nature of a gift, or grant, or donation to the institution of which the board is the trustee. Under the authority vested in it by section 836, above, "the board may use or appropriate" this fund for the purpose for which it was raised "and none other." There can be no difference in legal contemplation in the use of the money for the purpose of erecting a building and in using it to repay money borrowed for the immediate erection of the building, and therefore the board has ample authority to pledge this accumulation along with the future fees to be paid by the students, and the revenues from the building. There is nothing in our Constitution or Codes which renders such a pledge illegal.

Other questions raised by the pleadings, but not argued, have been examined and found to be without merit.

The writ of injunction for which relator prays is denied and the proceeding dismissed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, STEWART and ANDERSON concur.