J.S. HOLT, Secretary, Board of Regents, University of WisconsinSystem
You advise that the Board of Regents adopted a resolution calling for the implementation, on a trial basis, of a legal services proposal at the University of Wisconsin-Oshkosh supported by a segregated fee and the Regents desire clarification of the opinion issued on February 29, 1972, to Robert W. Winter, assistant director of the Wisconsin State Universities System, which relates to the use of the segregated fee under sec. 37.11 (8) (a), Stats., which reads as follows in relevant part:
 ". . . The board of regents may also charge any student laboratory fees, book rents, fees for special departments or any incidental fee covering all such special costs. . . ."
That opinion, 61 OAG 120, advised that the Regents may charge student fees only for activities that relate to a legitimate educational purpose, and it was pointed out that whether a proposed student activity fee for the purpose of acquiring accident, death, and disability insurance coverage for occurrences arising out of University sanctioned activities involving off-campus travel relates to a legitimate school function depends upon whether the Regents can, as a matter offact, identify the use of the fee with a legitimate educational purpose. Depending on the type of insurance involved and the activities involved, it was left for the Board to determine if there can be identified a worthwhile benefit which can be demonstrated as relating to the educational purposes of the ch. 37 institutions.
The key sentence in the opinion to Robert W. Winter is as follows: *Page 386 
 ". . . If, in the Board's opinion, a worthwhile benefit is achieved, which benefit can be demonstrated as relating to the educational purposes of the Chapter 37 Institutions, the fee may be imposed and the insurance program initiated. . . ." (61 OAG 120, 122.)
From information provided to this office, it appears that the Oshkosh Student Association has made a proposal to the Regents for the adoption and approval of a Student Legal Services Program at the University of Wisconsin-Oshkosh. It also appears that the Student Association has sponsored a legal services program at Oshkosh since the 1969-70 school year, which has been self-funding. The initial idea was to provide a counseling service for students, involving no litigation or other legal work. A lawyer was engaged and a minimum charge of $5 per client was made for a 15-minute appointment. The Association canvassed student organizations and asked for donations to finance the program.
Later, under a new director, the funds were obtained primarily through endorsement and fees paid the Association by the Globe Life Insurance Company. The Association endorsed that insurance company's policy during the years from 1970 through 1973. Two lawyers eventually were employed on a part-time basis, holding office hours in Reeve Union on Tuesday and Thursday nights. One of the lawyers suggested altering the program by charging students an extra fee for any legal service provided other than purely verbal counseling and advising. Because of a constantly increasing work load and subsequent paper work, a secretary was hired. Thereafter, attempts were made to secure the program's funding from the student activity fee. Representatives of the program appeared before the Council of Chancellors of the University of Wisconsin System and the question was then referred to the Board of Regents. In September of 1972 Mr. Steve Ballard, director of the Legal Services Program at Oshkosh, Mr. Mark Mitchell, Oshkosh Student Association president, and Attorney Wallace P. Barlow appeared before the Business and Finance Committee of the Board of Regents. A motion to refuse funding was defeated by a 3-to-3 tie vote. The issue was then presented to the entire Board of Regents, where it was tabled on November 3, 1972. *Page 387 
The Legal Services Program at Oshkosh, which apparently is now being handled by Mr. Barlow alone, has performed a variety of legal services, having served more than 750 students in the 1972-73 school year. In the recent proposal submitted to the Regents, 69 different types of legal questions are listed on which the attorneys have apparently given legal assistance and advice to the students at Oshkosh.
It appears that many of the types of cases involve advising the individuals as to legal rights and consequences and referring the cases to other authorities, but many of the cases lead to court action either directly or indirectly.
On January 11, 1974, the Regents removed the legal services proposal from the table and resolved that the proposal ". . . be deemed of potential benefit to students and a legitimate institutional function in the manner of segregated fee-supported activities sufficient to merit its implementation on a trial basis as a segregated fee-supported activity at UW-Oshkosh . . ." This approval was conditioned upon the approval of the chancellor, an opinion of the attorney general, and other stated conditions.
Your question not only relates to a clarification of the Winter opinion, but to the basic question as to whether a legal services program as described may be supported by student fees exacted under the authority of sec. 37.11 (8) (a), Stats. Although this section has been given liberal administrative interpretation (61 OAG 120, 122), the rule remains that statutes affecting personal or property rights are to be strictly construed. 15 Callaghan's Wis. Digest, Statutes, sec. 190. Also, ". . . an incorporated university . . . or an incorporated board of regents . . ., as in the case of any other corporation, can do no act for which authority is not expressly or impliedly granted . . ." 14 C.J.S.,Colleges and Universities, sec. 6.
In my opinion the language of the resolution does not indicate that the Regents have identified a benefit from the proposed legal services program which can be "demonstrated as relating to the educational purposes of the Chapter 37 Institutions." There is also a great deal of doubt as to whether such a nexus could be made between a compulsory fee-supported legal services program and the educational purposes of the University of Wisconsin-Oshkosh so as to be able to *Page 388 
assure the Regents that the program could be successfully defended against legal attack.
In Opinion 7-051 issued September 10, 1971, the Attorney General of Ohio, William J. Brown, advised the President of Ohio University that state funds could not be used to finance an office of student defender at a state university where such office would represent students in criminal and civil proceedings. The reasoning was that the student defender office could not be realistically justified as advancing the well-being of the communal body or promoting the purpose of education.
Other Attorneys General and university counsel have been considering similar problems in recent years. In some states, student groups have sought funds from mandatory fees to hire lawyers and scientists on a full-time basis to devote efforts toward "constructive social change" by studying and working for change in such areas as consumer protection, environmental protection, occupational health and safety, and housing, to name a few. These groups are known as Public Interest Research Groups (PIRGs).
An opinion of the Attorney General of Maryland, dated August 14, 1973, takes the position that state institutions of higher education are without authority to impose on students a mandatory fee for the benefit and support of the Maryland Public Interest Research Group because
 ". . . it does not appear that support of this organization is either necessary and convenient to accomplish the objects for which the State institutions of higher education have been founded, nor that the support of MaryPIRG is reasonably incidental to the main purpose of maintaining these academic institutions, nor even that it is associated with the well-being of the academic community of an educational institution."
The Attorney General further advised that it would be within the discretion of each institution's governing board to determine, as a matter of policy, "whether it wishes to act as a collection agency for voluntary contributions to MaryPIRG by its students," and that, moreover, each institution could determine "whether a PIRG meets its qualifications for a recognized student activity entitled to request an allocation from the regular student activities fee." *Page 389 
In yet another instance, where PIRG proposed that the University of Massachusetts collect a two-dollar fee every semester from every student with unwilling students requesting subsequent refunds, the Board of Trustees was advised by University counsel on May 25, 1972, that the proposed fee was mandatory in nature and could not be authorized by the Board. The Board was further advised that while any mandatory fees charged must be necessary and convenient to accomplish the objects for which the University was founded, and the Board could exercise powers which were incidental to the main educational purpose of the institution, "WMPIRG's activities are not close enough to the main activities of the University. Accordingly, the Board is unauthorized to approve this fee mechanism on the ground of customary or traditional power." The Board also was advised, however, that it did have the authority to approve or reject the collection of the PIRG fee "at the voluntary request of a student" for transmission to PIRG. See "Legal Aspects of Student Activities Fees," Journal of College and University Law (Winter 1973-74), Vol. 1, No. 2, p. 190.
The "necessary and convenient" standard mentioned in the Maryland Attorney General's opinion is substantially the same standard applied by the Wisconsin Supreme Court in Priest v.Regents (1882), 54 Wis. 159, 11 N.W. 472. There the court concluded that fees could be properly charged students for the expense of heating and lighting of public halls and rooms of the University. The court considered the payment of such fees as ". . . an expense necessary and convenient to accomplish the objects mentioned in the statute, and that the general powers granted to the board of regents authorized them to enact the by-law in question . . ."
Here, if the payment of a compulsory fee were attacked, it is certainly questionable whether the proper nexus of "necessary and convenient" could be established. For one thing, the resolution does not limit the program proposed in its scope.
For instance, although the proposal offered by the Oshkosh Student Association provides that the attorney could not represent students, faculty, or staff members of the University of Wisconsin System at any stage in any proceeding in federal, state, county, or local court where such proceeding is antagonistic to the University of Wisconsin System or any person in his official capacity as an officer *Page 390 
of the System, it does not prohibit suits against officials of the System in their individual capacity.
This would mean that suits could be brought against individual regents, the president, the chancellors, and all other officials of the University System in their individual capacities under either state or federal law. Whether this is advisable is for the Regents to determine within the legal guidelines that the fee must be for "an expense necessary and convenient" to accomplish the purposes for which the University has been founded. It would not appear that authorizing the use of such compulsory fees on a "trial basis" as stated in the resolution would be wise unless it can first be determined that such use falls within the "necessary and convenient" category. See Stringer v. Gould (1970),64 Misc. 2d 89, 314 N.Y.S. 2d 309, where the Supreme Court of New York held that where a student fee was mandatory in nature the Board of Trustees would be required to determine in advance whether expenditures from a fund created by the fees were for the purposes authorized.
I must conclude, therefore, that the Regents should give this matter further study and at least be prepared to limit the scope of any proposed program, place controls on any such operation, and identify how the fees will be used to necessarily and conveniently further the objects for which the University of Wisconsin-Oshkosh was founded.
I am aware of the provisions of sec. 36.09 (5), as created by ch. 335 of the Laws of 1973 (July 8, 1974), which provides in part as follows: ". . . Students in consultation with the chancellor and subject to the final confirmation of the board shall have the responsibility for the disposition of those student fees which constitute substantial support for campus student activities. . . ."
It is my opinion that the Regents' duties as set out above are unchanged by sec. 36.09 (5).
RWW:LLD *Page 391